IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   1:24-CR-392 (MAD) |
| | ) | |
| v. | ) | **Superseding Indictment** |
| | ) | |
| **KRIS ROGLIERI,** | ) | Violations:   18 U.S.C. §§ 1349, 1343 |
| | ) | [Conspiracy to Commit |
| **Defendant.** | ) | Wire Fraud] |
| | ) | |
| | ) | 18 U.S.C. § 1343 |
| | ) | [Wire Fraud] |
| | ) | |
| | ) | |
| | ) | |
| | ) | Six Counts & Two Forfeiture Allegations |
| | ) | |
| | ) | Counties of Offenses:  Albany & Warren |
| | ) | |

## THE GRAND JURY CHARGES:

### Background

At all times relevant to this superseding indictment:

1. The defendant, **KRIS ROGLIERI**, resided in Warren County, New York.

2. Prime Capital Ventures, LLC ("Prime Capital") and its affiliate, Prime Commercial Lending, LLC ("Prime Commercial"), were companies based in Albany, New York, that purported to be involved in commercial lending.

3. **ROGLIERI** founded Prime Capital in December 2021 and was the Chief Executive Officer and sole member of both Prime Capital and Prime Commercial.

4. Kimberly Owen a/k/a Kimberly "Kimmy" Humphrey (hereinafter, "Humphrey"), a resident of Virginia Beach, Virginia, was Executive Vice President of Prime Capital.

5. Christopher Snyder, a resident of Virginia Beach and Humphrey's brother, worked for Prime Capital.

## COUNT 1
### [Conspiracy to Commit Wire Fraud]

**The Conspiracy**

6. Paragraphs 1 through 5 are hereby realleged and incorporated by reference as if fully set forth herein.

7. Between in or around March 2022 and January 2024, in Albany and Warren Counties in the Northern District of New York, and elsewhere, the defendant, **KRIS ROGLIERI**, conspired with Kimberly Owen a/k/a Kimberly "Kimmy" Humphrey and Christopher Snyder to commit wire fraud by devising and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, and transmitting and causing to be transmitted by means of wire communication in interstate commerce writings, signs and signals for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343.

**Object of the Conspiracy**

8. The object of the conspiracy was to fraudulently obtain tens of millions of dollars from Prime Capital's borrower clients and prospective borrower clients by making false and fraudulent representations and promises to the clients and prospective clients about lending arrangements, including but not limited to falsely representing and promising that (a) Prime Capital was able to legitimately fund, or legitimately secure funding for, large commercial loans, and that (b) Interest Credit Account ("ICA") payments, to be paid by the borrower clients to Prime Capital, would be used solely in connection with the clients' loans and would be refunded if those loans did not materialize.

2

## Manner and Means

It was a manner and means of the conspiracy that:

9. **ROGLIERI**, Humphrey, and Snyder, acting through Prime Capital, issued to a prospective borrower client a letter of intent ("LOI") to fund a loan, and asked the borrower client to pay a fee to Prime Capital for due diligence that Prime Capital claimed to perform while purportedly assessing the client's project and purportedly securing loan funding for the project. Prime Capital typically charged a due diligence fee of $25,000 to $75,000 per project.

10. Following Prime Capital's receipt of a due diligence fee and a signed LOI from the borrower client, if a client continued to be interested in obtaining a loan from Prime Capital, Prime Capital signed a line of credit ("LOC") agreement with the client and obtained an upfront interest payment from or for the benefit of the client while promising to start funding the client's loan within a certain amount of time. But Prime Capital never had a proven and legitimate source of funding for the loans it agreed to make. At all relevant times, **ROGLIERI** knew that Prime Capital could not fund any loan on the timetable to which it had contractually agreed.

11. The upfront interest payment was characterized by Prime Capital as the "Interest Credit Account Payment," or "ICA" payment for short. **ROGLIERI** represented that each borrower client's ICA payment would be debited over time as a loan was funded and accrued interest. Depending on the size of the loan that Prime Capital promised, an ICA payment could be in the millions of dollars. Prime Capital obtained ICA payments as large as $20 million. Prime Capital promised that an ICA payment would be kept in a "pledged" bank account and would be fully refundable within a specified timeframe if the contemplated loan did not materialize. As **ROGLIERI** explained to a borrower client during a recorded Zoom call in December 2023:

3

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack . . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us ... number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client ... would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account throughout the term. ... There really isn't any risk. The [ICA] money gets put into a pledged account.

As **ROGLIERI** well knew, these statements were false and omitted material information because, among other things, Prime Capital had never funded a loan in the manner he described, ICA payments were not deposited into a pledged account or accounts, ICA payments were not used to cover interest payments on loans, he was using ICA payments to fund his own purchases of luxury goods, and Prime Capital was not providing clients with monthly or quarterly statements that demonstrated how much of the ICA payments had been drawn down.

12.  Prime Capital had been unsuccessful in legitimately funding loans for its borrower clients since its founding in December 2021. **ROGLIERI** nevertheless paid for advertising falsely stating that Prime Capital had successfully funded large commercial projects. For instance, in or around May 2022, Prime Commercial posted to its web site, and to YouTube, an approximately four-minute video stating in pertinent part that "Prime Commercial Lending through its fund Prime Capital Ventures is proud to announce the $188,000,000 funding of" a hotel project in Atlanta, Georgia. The video also stated in pertinent part, "WE Are Not Bankers … We Are Entrepreneurial Bankers," referring to Prime Commercial, Prime Capital, or both. As **ROGLIERI** well knew, neither Prime Commercial nor Prime Capital had actually obtained or

4

provided any funding for this hotel project, which had failed; and neither Prime Commercial nor Prime Capital was a bank or capable of legitimately funding large commercial loans. Moreover, **ROGLIERI** asked Individual-1, a resident of Fulton County, Georgia, and the creator of the hotel project, to act as a reference for Prime Capital. **ROGLIERI** paid Individual-1 to act as a reference for Prime Capital, which was not disclosed to the clients who spoke to Individual-1. Between in or about June 2022 and in or about December 2023, **ROGLIERI** paid Individual-1 a total of approximately $225,000.

13. Because Prime Capital never had a source of loan funding, **ROGLIERI** used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to, older borrower clients, contrary to **ROGLIERI's** and Prime Capital's promises that each ICA payment would be kept in a pledged account and would be used only for the benefit of the client that made the ICA payment. **ROGLIERI** also drew on ICA payments to pay his debts (including amounts owed to the Internal Revenue Service), enrich himself and create the illusion that he was wealthier and more successful than he actually was, including by purchasing million-dollar vehicles, luxury watches and jewelry, and domestic and international travel by private jet. He also drew on ICA funds to pay Humphrey, Snyder, and Individual-1.

14. For instance, **ROGLIERI**, on behalf of Prime Capital, signed an LOC with borrower client Onward Partners, LLC dba Brandless ("Onward"), dated September 7, 2022, in which Prime Capital agreed to issue a loan of up to $107 million. The LOC, which Prime Capital drafted, required Onward to provide a $20 million ICA payment to Prime Capital. The LOC provided that "the ICA shall remain part of the Interest Reserve Account" and that "[a]ll credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the [loan] Advances as and when such

interest payments are due and payable."

15.     On or about September 21 and 22, 2022, pursuant to its LOC with Onward, Prime Capital received an ICA payment comprised of three wire transfers totaling $20 million deposited into a recently opened account in Prime Capital's name at Citibank.

16.     Between on or about October 4, 2022 and on or about October 13, 2022, as part of the fraudulent scheme, **ROGLIERI** initiated wire transfers that transferred a net total of approximately $3.2 million of Onward's ICA payment to another company that **ROGLIERI**, through Prime Capital, had previously agreed to provide a $20 million loan. **ROGLIERI** then spent and transferred the remainder of Onward's $20 million ICA payment. Between in or around December 2022 and in or around November 2023, **ROGLIERI** used newer clients' ICA payments to return $17 million to Onward.

17.     **ROGLIERI**, on behalf of Prime Capital, signed a LOC agreement with borrower client 1322 Developments, LLC ("1322 Developments"), dated August 25, 2023, in which Prime Capital agreed to issue a loan of up to $46,350,000. The LOC, which Prime Capital drafted, required 1322 Developments to provide an ICA payment of $15 million to Prime Capital. The LOC provided that "the ICA shall remain part of the Interest Reserve Account" and that "[a]ll credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the [loan] Advances as and when such interest payments are due and payable."

18.     In or around September 2023, pursuant to its LOC with 1322 Developments, Prime Capital received an ICA payment comprised of two checks totaling $14,249,832. **ROGLIERI** deposited the checks into a recently opened account in Prime Capital's name at RBC Capital Markets.

19. As part of the fraudulent scheme, on or about September 26, 2023, **ROGLIERI** initiated a wire transfer of $7 million of 1322 Developments' ICA payment from the RBC Capital Markets account to an account at Farmers State Bank (Illinois) in the name of Prime Capital. **ROGLIERI** and Humphrey then initiated wire transfers of the ICA funds from the Farmers State Bank account to other bank accounts connected to at least four other projects that Prime Capital had agreed to fund, but which had nothing to do with 1322 Developments.

20. On or about October 3, 2023, **ROGLIERI** pledged the remaining $7,249,832 held in the RBC Capital Markets account to Royal Bank of Canada ("RBC") to obtain a $6 million line of credit from RBC. **ROGLIERI** then quickly exhausted the $6 million line of credit, sending $5 million to a KeyBank account in Prime Capital's name on or about October 11, 2023, and sending the remaining $1 million to that same KeyBank account on or about October 16, 2023.

21. Prime Capital never loaned any funds to 1322 Developments, nor did it refund the ICA payment when 1322 Developments and its affiliates demanded it back pursuant to the terms of the LOC.

22. 1800 Park Avenue LLC ("1800 Park") was a Minnesota company that sought Prime Capital's assistance in obtaining a loan to build a commercial egg production facility.

23. In or around December 2023, **ROGLIERI**, Humphrey, and Snyder fraudulently sought and obtained a $5 million ICA payment from 1800 Park. **ROGLIERI**, Humphrey, and Snyder did so under the false contractual promise and representation that the funds would be kept in a "separate and distinct account" and would be refundable if Prime Commercial and 1800 Park did not enter into an agreement for an approximately $100 million LOC. No such agreement was entered.

24. **ROGLIERI** had no intention of maintaining 1800 Park's funds as promised. Instead, he used the funds for, among other things, Prime Capital's business expenses unrelated to 1800 Park and to fund his extravagant lifestyle.

25. On or about December 22, 2023, 1800 Park transferred the $5 million payment to Prime Capital's KeyBank account. That same day, and because Prime Capital was in the midst of an involuntary bankruptcy proceeding, **ROGLIERI** transferred the $5 million from Prime Capital's KeyBank account to Prime Commercial's KeyBank account. **ROGLIERI** then stole and fraudulently used the funds as follows:

    a. On or about December 22, 2023, **ROGLIERI** transferred $950,000 to Company-1, a Prime Capital client based in Saratoga County, New York, as partial loan funding for Company-1's real estate project.

    b. On or about December 22, 2023, **ROGLIERI** transferred $2 million to a credit union account held by Company-2, a Virginia company controlled by an associate of Humphrey.

    c. On or about December 26, 2023, **ROGLIERI** paid $101,000 to Company-3, which provided private jet services, for round-trip private air travel between Albany International Airport and Anguilla. The flight was for a family vacation taken by **ROGLIERI** from on or about December 29, 2023 to on or about January 5, 2024.

    d. On or about December 26, 2023, **ROGLIERI** paid $84,000 to Company-4, which sold high-end watches, to purchase a Rolex day-date yellow gold diamond bezel watch.

    e. On or about December 29, 2023, **ROGLIERI** paid $400,000 to Law Firm-1, which represented Prime Capital in several court proceedings.

26. As part of the conspiracy, **ROGLIERI**, Humphrey, and Snyder also misrepresented, concealed, disguised, and failed to disclose material information to borrower

clients and others about the location, safekeeping, and use of the ICA payments, totaling more than $100 million. For instance, to conceal the fraud, **ROGLIERI** failed to provide clients with statements every month or every quarter showing how much of the ICAs had been drawn down.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
## [Wire Fraud]

27. Paragraphs 1 through 26 are hereby realleged and incorporated by reference as if fully set forth herein.

28. From at least December 2023 until in or around January 2024, in Warren County in the Northern District of New York, and elsewhere, the defendant, **KRIS ROGLIERI**, devised and intended to device a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions.

29. For the purpose of executing such scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, **ROGLIERI**, on or about the dates listed below, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, and signals, that is, wire transfer requests transmitted over the internet by **ROGLIERI** from his home in the Northern District of New York to KeyBank computers in Ohio initiating wire transfers from Prime Commercial's KeyBank account to the following recipients:

| Count | Approximate Date | Amount | Recipient of Wire Transfer |
|---|---|---|---|
| 2 | December 22, 2023 | $950,000 | Company-1 |
| 3 | December 22, 2023 | $2 million | Company-2 |
| 4 | December 26, 2023 | $101,000 | Company-3 |
| 5 | December 26, 2023 | $84,000 | Company-4 |
| 6 | December 29, 2023 | $400,000 | Law Firm-1 |

each in violation of Title 18, United States Code, Section 1343.

## FIRST FORFEITURE ALLEGATION

30. The allegations contained in Count 1 of this superseding indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

31. Upon conviction of an offense in violation of Title 18, United States Code, Sections 1349 and 1343, as set forth in Count 1 of this superseding indictment, the defendant, **KRIS ROGLIERI**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to the offense. The property to be forfeited includes, but is not limited to, the following:

   a. a money judgment of $183,818,821.82;

   b. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

   c. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

   d. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

   e. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

   f. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

   g. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

   h. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

10

i. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

j. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

k. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

l. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

m. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

n. One Ferrari Engine Table;

o. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held in the name of ABBJ, LLC;

p. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

q. A refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

r. One Richard Mille RM011 Watch with serial number 2722;

s. One Richard Mille RM 65-01 Watch;

t. One Rolex Watch, Serial Number 16JV1686;

u. One Rolex Watch, Serial Number: Y74R6549;

v. One Rolex Watch, Serial Number: 7P65S042;

w. One Rolex Watch, Serial Number: 0WU66577;

x. One Rolex Watch, Serial Number: 65R11547;

y. One Rolex Watch, Serial Number: 8S927086; and

z. Real Property Commonly Known as 600 Linkhorn Drive, Virginia Beach, VA 23451, more particularly described, as follows:

ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate in the City of Virginia Beach

11

>(formerly Princess Anne County), Virginia, and known, numbered and designated as Site One Hundred Fifty-Seven (157), as show on the Plat of Linkhorn Park, which plat is duly recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach (formerly Princess Anne County), Virginia in Map Book 5, Page 151.
>
>BEING ALL and the same lands and premises conveyed to Charles G. Barker and Susan L. Barker by 152 Pinewood Road, LLC, a Virginia Limited Liability Company in a Deed of Bargain and Sale dated *05/29/2020* and recorded *06/02/2020* in Document Number 20200602000466550, in the Clerk's Office of the Circuit Court of Virginia Beach, VA.

32. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

## SECOND FORFEITURE ALLEGATION

33. The allegations contained in Counts 2 through 6 of this superseding indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

34. Upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts 2 through 6 of this superseding indictment, the defendant, **KRIS ROGLIERI**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes and is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, the following:

   a. a money judgment of $5 million;
   b. One Rolex Watch, Serial Number 16JV1686;
   c. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held in the name of ABBJ, LLC; and
   d. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC.

35. If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), and 28 U.S.C. § 2461(c).

Dated: June 12, 2025

A TRUE BILL.    *Name Redacted

_____
Grand Jury Foreperson

JOHN A. SARCONE III
United States Attorney

By: _____
Joshua R. Rosenthal
Michael Barnett
Assistant United States Attorneys
Bar Roll Nos. 700730 & 519140