IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:24-CR-392 (MAD) |
| | ) | |
| **v.** | ) | **Plea Agreement** |
| | ) | |
| **KRIS ROGLIERI,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, and defendant **Kris Roglieri** (hereinafter "the defendant"), by and through the defendant's counsel of record, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure:

1) **The Defendant's Obligations:**

   a) **Guilty Plea:** The defendant will change the defendant's previously-entered plea of "not guilty" and plead guilty to Count 1 of the superseding indictment in Case No. 1:24-CR-392 (MAD) charging conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349, 1343.

   b) **Special Assessment:** The defendant will pay an assessment of $100 per count of conviction pursuant to 18 U.S.C. § 3013. The defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to the U.S. District Court, at the time of sentencing.

   c) **Compliance with Other Terms of Agreement:** The defendant will comply in a timely manner with all of the terms of this plea agreement.

d) **Restitution:**

1. The defendant consents to entry of an order directing the defendant's payment of restitution in full to any person or entity who qualifies as a victim of the defendant's crimes of conviction and all relevant conduct, whether or not they are identified in the charging instrument, or in the factual basis of the defendant's guilty plea. 18 U.S.C. § 3663(a)(1)(A) and (a)(3). The amount of restitution shall be ordered in an amount to be determined by the Court or agreed to by the parties.

2. The defendant agrees that any restitution not paid before sentencing will be due and payable immediately after sentencing and subject to immediate enforcement pursuant to 18 U.S.C. § 3613. The judgment will be subject to any payment terms set forth by the Court at sentencing and the defendant agrees that the Clerk of the Court may release funds to victims without undue delay upon receipt of restitution payments from the defendant.

3. The defendant understands that restitution will be enforced pursuant to 18 U.S.C. § 3572, 18 U.S.C. § 3613, and 18 U.S.C. § 3664(m), that restitution is in addition to any other civil or criminal penalty authorized by law, and that forfeiture and restitution are separate and distinct financial obligations that must be imposed upon a criminal defendant.

e) **Forfeiture:** Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the defendant will consent to entry of an order directing forfeiture to the United States of the property described in the Forfeiture Allegation in the superseding indictment described above, or to any substitute assets, or to a money judgment, all as more fully set out below:

1. A money judgment of $55,484,674.84;

2. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659;

3. One 2014 Ferrari LaFerrari, VIN #: ZFF76ZHB000203166;

4. One 2022 Mercedes Benz, VIN #: W1NYC8AJXNX445045;

5. One 1982 Mercedes Benz 500SL, VIN #: WDB10704612001675;

6. One 1989 Mercedes Benz 560 SEL, VIN #: WDB1260391A497466;

7. One 2007 Mercedes Benz SLR McLaren, VIN #: WDDAJ76F27M001391;

8. One 1987 Mercedes Benz 560, VIN #: WDB1260451A315331;

9. One 2004 Porsche Carrera, VIN #: WP0ZZZ98Z4L000069;

10. One 2022 Ferrari 812 Competizione, VIN #: ZFF03TLA5N0277054;

11. One 2020 Mercedes Benz GT63C4S, VIN #: WDD7X8KB3LA012445;

12. One 2006 Maserati MC 12 Corse, VIN #: ZAMDF44B000029626;

13. One 2023 Mercedes Benz, VIN #: W1K6X7KB5PA204980;

14. One Ferrari Engine Table;

15. $223,365.00 in U.S. currency seized from Thread Bank Account ending 7554 held in the name of ABBJ, LLC;

16. $467,810.00 in U.S. currency seized from Thread Bank Account ending 1832 held in the name of Capital Investments US, LLC;

17. A refund in the amount of $72,825.83 in U.S. Currency seized from Ai Design;

18. One Richard Mille RM011 Watch with serial number 2722;

19. One Richard Mille RM 65-01 Watch;

20. One Rolex Watch, Serial Number 16JV1686;

21. One Rolex Watch, Serial Number: Y74R6549;

22. One Rolex Watch, Serial Number: 7P65S042;

23. One Rolex Watch, Serial Number: 0WU66577;

24. One Rolex Watch, Serial Number: 65R11547;

25. One Rolex Watch, Serial Number: 8S927086; and

26. Real Property Commonly Known as 600 Linkhorn Drive, Virginia Beach, VA 23451,

more particularly described, as follows:

> ALL that certain lot, piece or parcel of land, with the buildings and improvements thereon, situate in the City of Virginia Beach (formerly Princess Anne County), Virginia, and known, numbered and designated as Site One Hundred Fifty-Seven (157), as show on the Plat of Linkhorn Park, which plat is duly recorded in the Clerk's Office of the Circuit Court of the City of Virginia Beach (formerly Princess Anne County), Virginia in Map Book 5, Page 151.

> BEING ALL and the same lands and premises conveyed to Charles G. Barker and Susan L. Barker by 152 Pinewood Road, LLC, a Virginia Limited Liability Company in a Deed of Bargain and Sale dated *05/29/2020* and recorded *06/02/2020* in Document Number 20200602000466550, in the Clerk's Office of the Circuit Court of Virginia Beach, VA.

If any of the property described above, as a result of any act or omission of the defendant, either: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e).

In the civil asset forfeiture case captioned *United States of America v. One 2003 Ferrari Enzo AB Version E, VIN #: ZFFCZ56B000132659 et al.*, No. 1:24-CV-01345-MAD-DJS, the defendant agrees to consent to entry of a judgment declaring the

4

Defendant Properties (as identified in that case) to be forfeited and condemned to the use and benefit of the United States.

f) **The Defendant's Obligations Regarding Assets and Financial Investigation:**

1. The defendant agrees to fully participate in the United States' pre- and post-judgment financial investigation. Such participation includes the identification of assets in which the defendant has any legal or equitable interest to determine what assets may be available for payment of restitution, forfeiture, and/or any fine imposed in this case. The defendant agrees that the defendant's financial information is subject to investigation and disclosure pre-judgment to the same extent as financial information will be subject to discovery after judgment is imposed.

2. The defendant authorizes the United States Attorney's Office to inspect and copy all financial documents and information provided by the defendant to the United States Probation Office, including those provided as a part of the Presentence Investigation.

3. The defendant acknowledges that he understands and agrees to the provision set forth in subsection I, below, regarding the determination of his financial condition and ability to pay restitution, fines, and other monetary penalties assessed by the Court.

2) **The Government's Obligations:**

a) **Dismissal of remaining charges:** Upon imposition of a sentence consistent with the terms of this agreement, the government will move to dismiss all charges against the defendant in Case No. 1:24-CR-392 (MAD) other than those to which the defendant pled guilty pursuant to this agreement and on which the Court imposed sentence. Such dismissal will be without prejudice, permitting the government to seek reinstatement of any and all of those charges if the guilty plea and sentence do not remain in effect.

b) **Non-prosecution for other offenses:** For so long as the defendant's guilty plea and the sentence remain in effect, the government will not seek other federal criminal charges against the defendant based on conduct described in the superseding indictment in Case No. 1:24-CR-392 (MAD) and/or in the paragraph of this agreement entitled "Factual Basis for Guilty Plea," occurring before the date on which the defendant signs this agreement. This agreement does not prevent the government from seeking charges based on other conduct.

c) **Compliance with Other Terms of Agreement:** The government will comply in a timely manner with all of the terms of this plea agreement.

3) **Potential Maximum Penalties:** The defendant understands that the Court can impose the following maximum penalties for the offense to which the defendant agrees to plead guilty:

a) **Maximum term of imprisonment:** 20 years, pursuant to 18 U.S.C. §§ 1349, 1343.

b) **Maximum fine:** $250,000, pursuant to 18 U.S.C. §3571(b)(3)

c) **Supervised release term:** In addition to imposing any other penalty, the sentencing court may require the defendant to serve a term of supervised release of up to 3 years, to begin after imprisonment. *See* 18 U.S.C. § 3583. A violation of the conditions of supervised release during that time period may result in the defendant being sentenced to an additional term of imprisonment of up to 2 years.

d) **Other adverse consequences:** Other adverse consequences may result from the defendant's guilty plea as further described in paragraph F below.

4) **Elements of Offense:** The defendant understands that the following are the elements of the offense to which the defendant agrees to plead guilty. The defendant admits that the defendant's conduct satisfies each and every one of these elements.

6

a) *First*, two or more persons conspired to knowingly and willfully participate in a scheme or artifice to defraud or to obtain money or property by materially false and fraudulent pretenses, representations, or promises, with knowledge of the scheme's fraudulent nature and specific intent to defraud, and reasonably foreseeing that one or more members of the conspiracy would use, or cause to be used, the interstate wires in furtherance of the scheme to defraud; and

b) *Second*, the defendant joined that conspiracy, either at its inception or sometime during its existence, knowing the purpose of the conspiracy and intending to help it succeed.

5) **Factual Basis for Guilty Plea:** The defendant admits the following facts, that those facts demonstrate the defendant's guilt for the offense to which the defendant is pleading guilty, and that there are no facts establishing a viable defense to that offense:

a) At all relevant times:

   1. Prime Capital Ventures, LLC ("Prime Capital") and Prime Commercial Lending, LLC ("Prime Commercial") were purported commercial lending businesses based in Albany, New York. The defendant, a resident of Warren County, New York, was the Chief Executive Officer and sole member of both entities.

   2. Kimberly Owen a/k/a Kimberly "Kimmy" Humphrey ("Humphrey"), a resident of Virginia, was Executive Vice President of Prime Capital.

   3. Christopher Snyder, also a Virginia resident and Humphrey's brother, worked for Prime Capital.

b) The defendant and Humphrey founded Prime Capital in December 2021. After founding the company, the defendant and Humphrey began claiming that Prime Capital had the present ability to make large commercial loans, including loans in the tens of millions of

dollars, through funding agreements with third-party hedge funds. As the defendant knew at all relevant times, Prime Capital had obtained no funds of its own and never had the present ability to independently make commercial loans of any size, and funding was based on possible third-party sources and funding agreements. Nevertheless, starting in mid-2022 and continuing until December 2023, the defendant and Humphrey falsely represented to Prime Capital's borrower clients and prospective borrower clients that Prime Capital could fund or obtain funding for large commercial loans in the tens of millions of dollars. During this period, the defendant, on behalf of Prime Capital, signed contracts with borrowers that obligated Prime Capital to fund hundreds of millions of dollars in loans.

c) The defendant and Humphrey created a process for clients that sought to obtain loans from Prime Capital. First, Prime Capital issued, and asked a prospective borrower client to sign, a letter of intent ("LOI") stating the size of the loan Prime Capital intended to provide to the client, an interest rate, and fees and payments to be made to Prime Capital. Once both parties signed the LOI, the client was required to pay a due diligence fee to Prime Capital for due diligence that Prime Capital claimed to perform while it assessed the borrower's project and purportedly secured financing for that project. Prime Capital typically charged a due diligence fee of $25,000 to $75,000 per project.

d) Following Prime Capital's receipt of a due diligence fee, and if a borrower client continued to be interested in obtaining a loan from Prime Capital, Prime Capital signed a line of credit ("LOC") agreement with the borrower client and obtained an upfront interest payment from or for the benefit of the borrower client while promising to start funding the borrower's loan within a specified timeframe, typically about four months.

e) This upfront interest payment was characterized by Prime Capital as the "Interest Credit Account Payment," or "ICA" payment for short. Once the ICA payment was wired from the borrower client to Prime Capital, an account on the books and records of Prime Capital was supposed to be created to serve as the "Interest Credit Account." A credit equal to the ICA payment was supposed to be noted in the Interest Credit Account for purposes of satisfying interest payments on the loan. Credits to each borrower's ICA payment were to be debited over time as a loan was funded and accrued interest. Depending on the size of the loan Prime Capital promised, an ICA payment could be in the millions of dollars; Prime Capital obtained ICA payments as large as $20 million. The defendant and Humphrey promised that an ICA payment would be fully refundable within a specified timeframe if the contemplated loan did not materialize. As the defendant explained to a borrower client during a recorded Zoom call in December 2023:

> So with our process, we usually require anywhere from 20 to 30 percent down on, based on the total capital stack . . . We call that the essentially the ICA, it's an Interest Credit Account. We require that down payment in the form of cash to us because we view it as, it really performs three functions for us ... number one, the ICA is considered essentially additional collateral for the loan throughout the term. Number two, it acts as pre-paid interest reserves, so theoretically our client never has to make a payment for us, payment to us on a quarterly or monthly basis when that money gets deposited in an account that we control in our name. The client ... would get a statement every month or every quarter showing how much was drawn down and the interest that is due on that and that is essentially how we get paid back through that ICA account throughout the term. ... There really isn't any risk. The [ICA] money gets put into a pledged account.

These statements were false and fraudulently omitted material information because, among other things, Prime Capital generally had not funded a loan in the manner the defendant described; ICA payments were not deposited into a pledged account or accounts; ICA

payments were not used to cover interest payments on loans; the defendant was using portions of ICA payments to fund his own purchases of luxury goods; and Prime Capital was not providing clients with monthly or quarterly statements demonstrating how much of the ICA payments had been drawn down.

f) In June 2022, Prime Capital accepted, from client Indigo Pharmaceuticals ("Indigo"), an ICA payment in the amount of $1 million, even though Prime Capital had no ability to fund the $20 million loan sought by Indigo. On July 8, 2022, Humphrey sent an email to the defendant titled, "Do not sign docs for pharmacy," in which she wrote, "You have no way to get them funded in 60 days now. You never ducking listen. Should have never taken in the money. But we're down to 60 days so do not sign the docs." By reply email on July 8, the defendant wrote to Humphrey, "Get yourself under control. NOW." During that same period, the defendant, on behalf of Prime Capital, signed contracts that obligated Prime Capital to provide a $20 million loan to Indigo.

g) Because Prime Capital never ultimately secured a proven, demonstrated or realized a source of loan funding, the defendant and his co-conspirators used ICA payments from newer borrower clients to partially fund loans to, and to refund ICA payments to, older borrower clients.[1] The defendant also drew on ICA payments to pay his own personal debts (including money owed to the Internal Revenue Service), enrich himself, and purchase million-dollar vehicles, luxury watches and jewelry, and domestic and international travel by private jet. He also drew on ICA funds to pay Humphrey, Snyder, and Individual-1.

---

[1] The defendant belatedly came to believe that the financial institution and third-party hedge fund with which Prime Capital had contracted in order to obtain a sizeable line of credit, had defrauded him out of most of the $20 million he transferred to them in October 2022

10

h) As an example of the fraud scheme, the defendant on behalf of Prime Capital signed an LOC with borrower client Onward Partners, LLC dba Brandless ("Onward"), dated September 7, 2022, in which Prime Capital agreed to extend a loan of up to $107 million. The LOC required Onward to provide a $20 million ICA payment to Prime Capital. The LOC provided that "the ICA shall remain part of the Interest Reserve Account" and that "[a]ll credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the [loan] Advances as and when such interest payments are due and payable."

i) On September 21 and 22, 2022, pursuant to its LOC with Onward, Prime Capital received an ICA payment through three wire transfers totaling $20 million deposited into a recently opened account in Prime Capital's name at Citibank. Between October 4 and 13, 2022, the defendant wired a net total of approximately $3.2 million of Onward's ICA payment to Indigo, another company that the defendant, through Prime Capital, previously agreed to provide a $20 million loan. The defendant then spent and transferred the remainder of Onward's $20 million ICA payment, including to the above-referenced third-party hedge fund and financial institution, for Prime Capital to obtain a line of credit. Then, from December 2022 to November 2023, the defendant used newer clients' ICA payments to return $17 million to Onward.

j) In January 2023, the defendant used approximately $3.8 million in due diligence and ICA funds to buy a house located at 600 Linkhorn Drive in Virginia Beach for Humphrey to use as a residence and office.

k) During the conspiracy, the defendant, on behalf of Prime Capital, signed a LOC agreement with borrower client 1322 Developments, LLC ("1322 Developments"), dated August 25,

11

2023, in which Prime Capital agreed to issue a loan of up to $46,350,000. The LOC required 1322 Developments to provide an ICA payment of $15 million to Prime Capital. The LOC provided that "the ICA shall remain part of the Interest Reserve Account" and that "[a]ll credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the [loan] Advances as and when such interest payments are due and payable." A separate Intercreditor Agreement, which the defendant signed on August 24, 2023, provided that the ICA payment would be deposited into a "locked pledged account" and that ICA funds "are only to be used for the purpose" of securing capital for the loan, paying interest due, or refunding the ICA payment.

l) In September 2023, Prime Capital received an ICA payment from 1322 Developments through two checks totaling $14,249,832, which the defendant deposited into a recently opened account in Prime Capital's name at RBC Capital Markets. On September 26, 2023, the defendant wired $7 million of 1322 Developments' ICA payment to an account at Farmers State Bank (Illinois) in the name of Prime Capital. The defendant and Humphrey then initiated wire transfers of the ICA funds from the Farmers State Bank account to other bank accounts connected to at least four other projects that Prime Capital had agreed to fund, but which had nothing to do with 1322 Developments. On October 3, 2023, the defendant pledged the remaining $7,249,832 held in the RBC Capital Markets account to Royal Bank of Canada ("RBC") to obtain a $6 million line of credit from RBC, for the purpose of funding loan agreements, as suggested by the third-party hedge fund with which Prime Capital had contracted. The defendant then quickly exhausted the $6 million line of credit, sending $5 million to a KeyBank account in Prime Capital's name on October 11,

12

2023, and sending the remaining $1 million to that same KeyBank account on October 16, 2023. In the end, Prime Capital never loaned any funds to 1322 Developments, nor did it refund the ICA payment when 1322 Developments and its affiliates demanded it back pursuant to the terms of the LOC.

m) Finally, in December 2023, the defendant, Humphrey, and Snyder fraudulently obtained a $5 million ICA payment from 1800 Park Avenue LLC ("1800 Park"), a company that sought Prime Capital's assistance in obtaining a loan to build an egg production facility. 1800 Park made this ICA payment based on the defendant's false contractual promise, based on a provision that the borrower's attorney requested just prior to signing the agreement, that the funds would be kept in a "separate and distinct account" and would be "refundable" if Prime Capital and 1800 Park did not enter into an agreement for an approximately $100 million LOC. The defendant, Humphrey, and Snyder sought 1800 Park's ICA payment even after learning, on December 19, 2023, that several of Prime Capital's creditors had started an involuntary bankruptcy proceeding against Prime Capital in the United States Bankruptcy Court for the Northern District of New York.

n) On December 22, 2023, after the defendant and 1800 Park signed a contract prepared by Snyder, 1800 Park transferred a $5 million ICA payment to a Prime Capital account at KeyBank controlled by the defendant.

o) The defendant then transferred, stole, and fraudulently used the funds by initiating wire transfers over the Internet from his home in Warren County to KeyBank servers in Ohio. These transfers included:

- On December 22, 2023, the defendant transferred $950,000 to an existing Prime Capital client based in Saratoga County, New York, as partial loan funding for the client's real estate project.

- On December 26, 2023, the defendant paid $101,000 for round-trip private air travel between Albany International Airport and Anguilla for a family vacation.

- On December 26, 2023, the defendant paid $84,000 for a Rolex day-date yellow gold diamond bezel watch.

p) During the defendant's involvement in the conspiracy, more than a dozen victim borrowers paid Prime Capital and Prime Commercial due diligence fees and ICA payments exceeding $50 million based on false representations about Prime Capital's ability to secure funding and false promises that ICA payments would be refundable within a specified timeframe.

q) The defendant obtained $55,484,674.84 in proceeds in connection with his operation of Prime Capital and Prime Commercial. Additionally, the property described in Paragraph 1(e)(2)-(26) was purchased with proceeds from the offense of conviction.

6) **Sentencing Stipulations:**

a) The parties agree that for Count 1, the base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).

b) The parties agree that for Count 1, the offense involved a reasonably foreseeable loss of more than $25 million but less than $65 million, resulting in a 22-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

c) The parties agree that for Count 1 the offense involved more than 10 victims, resulting in a 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

d) It is the government's position that the defendant was an organizer, manager, supervisor, or leader in the criminal activity, resulting in a 2-level increase pursuant to U.S.S.G. § 3B1.1(c). The defendant does not agree that this enhancement should apply.

e) The government will recommend a 2-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(a) if, (i) through the time

of sentencing, the government is convinced that the defendant has demonstrated "acceptance of responsibility" for the offense to which the defendant is pleading guilty and all relevant conduct, as defined in U.S.S.G. § 1B1.3; and (ii) the government does not determine that the defendant, after signing this agreement, committed any other federal, state, or local crimes, or engaged in conduct that constitutes "obstruction of justice," as defined in U.S.S.G. § 3C1.1.

f)  The government will move for a 1-level downward adjustment to the applicable federal sentencing guidelines offense level pursuant to U.S.S.G. § 3E1.1(b) if the government is convinced that the defendant has accepted responsibility within the meaning of U.S.S.G. § 3E1.1(a) and further assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, and the defendant otherwise qualifies for such adjustment by having a combined offense level of 16 or more before receipt of any acceptance of responsibility adjustment under U.S.S.G. § 3E1.1(a).

These stipulations are non-exhaustive. Both parties retain the right to urge the sentencing Court to find that a particular offense level, criminal history category, ground for departure, or guidelines range applies. Both parties may advocate for the application of guideline provisions other than those to which they have stipulated. Disputed provisions noted in the stipulations do not restrict either party from advocating for other provisions not addressed.

The stipulations do not constitute either party's estimate of what the defendant's total offense level, criminal history category, or guidelines range will be. Even if the stipulations match

either party's current expectations of the total offense level, criminal history category, or guidelines range, and even if those expectations have been communicated, both parties remain free to determine for any reason, even based on information already in their possession, that guideline provisions other than those stipulated to also apply and advocate for those provisions.

Under certain circumstances, the defendant's criminal history may affect the defendant's offense level under the federal sentencing guidelines. Should the presentence investigation reveal prior criminal convictions, or details regarding prior criminal convictions, of which the government lacked actual knowledge at the time it signed this agreement, the parties are not bound by any stipulations to guideline provisions affected by the defendant's criminal history and may advocate with respect to how the defendant's criminal history affects the offense level.

7) **Waiver of Rights to Appeal and Collateral Attack:** The defendant waives (gives up) any and all rights, including those conferred by 18 U.S.C. § 3742 and/or 28 U.S.C. §§ 2241 and 2255, to appeal and/or to collaterally attack the following:

a) The conviction resulting from the defendant's guilty plea;

b) Any term of imprisonment of 70 months or less;

c) Any sentence to a fine within the maximum permitted by statute;

d) Any sentence to a term of supervised release within the maximum permitted by statute;

e) Any condition of supervised release on any ground (including procedural or substantive unreasonableness) that the defendant did not raise in the District Court despite both (i) notice in the presentence investigation report that the Probation Office had recommended the condition and (ii) an opportunity to object in the District Court;

f) Any order of forfeiture or restitution imposed by the Court that is consistent with governing law and is not contrary to the terms of this agreement; and

16

g) Any special assessment permitted by statute.

Nothing in this appeal waiver is meant to be or should be construed as a representation of or agreement concerning the appropriate sentence in this case. The government and the defendant agree that this waiver applies regardless of whether any term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. If the Court imposes a term of imprisonment at or below the number of months specified above, the defendant's waiver of appeal and/or collateral attack includes any claim of procedural or substantive error in the determination or imposition of the term of imprisonment. If the Court imposes a term of supervised release and/or a fine within the maximum permitted by statute, the defendant's waiver of appeal and/or collateral attack includes any claim of procedural or substantive error in the determination or imposition of the term of supervised release and/or fine.

The defendant further waives the right to raise on appeal or on collateral review any claim that (a) the statutes to which the defendant is pleading guilty are unconstitutional and (b) the admitted conduct does not fall within the scope of the statutes. The defendant does not waive the right to raise a claim of ineffective assistance of counsel in an appeal or collateral attack on his conviction and sentence.

---

## Additional Plea Agreement Provisions

A. **Right to Counsel:** The defendant has the right to be represented by counsel—and if necessary have the court appoint counsel—at trial and at every other stage of the proceeding. Defense

counsel has advised the defendant of nature of the charges to which the defendant is agreeing to plead guilty and the range of possible sentences.

B. **Waiver of Trial-Related Rights:** The defendant has the following additional constitutional rights in connection with the charges in this case: (i) to be presumed innocent until proven guilty beyond a reasonable doubt; (ii) to plead not guilty; (iii) to trial by jury; (iv) to confront, cross-examine, and compel the attendance of witnesses at trial; (v) to present defense evidence; and (vi) to remain silent and be protected against compelled self-incrimination. The defendant understands that by pleading guilty, the defendant waives (gives up) these rights.

C. **Court Not Bound by Plea Agreement:** This plea agreement is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The Court is neither a party to, nor bound by this Plea Agreement. The Court may accept or reject this Plea Agreement or defer a decision until it has considered the Presentence Investigation Report prepared by the United States Probation Office. If the Court rejects the provisions of this agreement permitting the defendant to plead guilty to certain charges in satisfaction of other charges, the Court will permit the defendant to withdraw the plea of guilty before sentencing, pursuant to Fed. R. Crim. P. 11(c)(5) & (d).

D. **Court Not Bound by Agreed-Upon Recommendations, Stipulations, and Requests:** If this agreement contains any provisions under Fed. R. Crim. P. 11(c)(1)(B) by which the government agrees to recommend, stipulates, or agrees not to oppose the defendant's request, that a particular sentence or sentencing range is appropriate or that a particular provision of the federal sentencing guidelines, or a policy statement, or sentencing factor does or does not apply, such a recommendation, stipulation, or request does not bind the Court, which may make independent factual findings by a preponderance of the evidence and may reject such

18

recommendations, requests, and stipulations between the parties. If the Court rejects one or more recommendations, stipulations, or requests, the defendant is not entitled to withdraw the defendant's plea of guilty and is not released from the obligations described in this agreement. Under such circumstances, the government reserves the right to support and defend, in connection with any post-sentencing proceedings, any decision the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations, stipulations, or requests set out in this agreement.

E. **Sentencing:**

1. **Maximum terms of imprisonment:** The defendant understands that the Court has discretion to impose a sentence within the statutory maximum sentence(s) set out in this agreement. If the defendant is pleading guilty to multiple charges, the Court may be required by law to have the sentences of imprisonment on the convictions resulting from those charges run consecutively to each other. Otherwise, the Court has discretion to have sentences of imprisonment run concurrently or consecutively. *See* 18 U.S.C. § 3584.

2. **Sentencing guidelines:**

   a) The actual sentence to be imposed upon the defendant is within the discretion of the sentencing Court, subject to the statutory maximum and mandatory minimum penalties, as described above, and the provisions of the Sentencing Reform Act and the United States Sentencing Guidelines promulgated thereunder. While the Court is not bound to impose a sentence within the applicable sentencing guidelines range, it must take into account the sentencing guidelines, along with the other factors set forth in 18 U.S.C. § 3553(a).

b) This Plea Agreement does not contain an estimate of the defendant's offense level, criminal history category, or sentencing guidelines range. Any estimate of the defendant's offense level, criminal history category, and sentencing guidelines range provided before sentencing is preliminary and is not binding on the parties to this agreement, the Probation Office, or the Court, and any deviation from it for any reason by any party shall not constitute a breach of the plea agreement.

c) Until the Probation Office has fully investigated the defendant's criminal history, it is not possible to predict with certainty the defendant's criminal history category and, in some cases, the defendant's offense level.

3. **Factual findings:** The defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the defendant or stipulated by the parties. In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant understands that the sentence imposed may be determined based upon such judicial fact-finding.

4. **Use of the Defendant's Statements:** The defendant understands that the sentencing court may consider any statement that the defendant has made or makes in this Plea Agreement, during the guilty plea, to the Probation Office, and at sentencing when imposing sentence. In addition the government may be able to use the defendant's statements in this agreement and at the guilty plea and at sentencing in any criminal, civil, or administrative proceeding. For example, if the defendant fails to enter a guilty plea (as required by this agreement) or the defendant's guilty plea is later withdrawn or vacated for any reason other than the

20

Court's rejection of this Plea Agreement under Fed. R. Crim. P. 11(c)(5), the government may introduce the defendant's statements into evidence in any prosecution. If, however, the Court rejects this Plea Agreement under Fed. R. Crim. P. 11(c)(5), and the defendant withdraws the guilty plea pursuant to Fed. R. Crim. P. 11(d)(2)(A), the government will not be permitted to use any of the defendant's statements in this Plea Agreement. To the extent that Rule 11(f) of the Federal Rules of Criminal Procedure and/or Rule 410 of the Federal Rules of Evidence are inconsistent with this paragraph, the defendant waives (gives up) any protections under those rules.

5. **Government's Discretion to Recommend a Sentence:** Unless a stipulation in this agreement explicitly limits the government's discretion with respect to its recommendations at sentencing, this agreement does not prevent the government from recommending a specific sentence within the applicable guidelines range as determined by the Court or as urged by the government; or, if the government deems appropriate, recommending that the Court impose a sentence above the applicable guidelines range.

6. **Sentencing-Related Information:** The government has the right to advise the sentencing Court and the Probation Office of any information, in aggravation or mitigation of sentencing, whether or not encompassed within the count(s) to which the defendant has agreed to plead guilty, subject only to the limitation described in U.S.S.G. §1B1.8. No stipulation in this plea agreement limits the obligations of both parties to ensure that the sentencing Court has all information pertinent to its determination of an appropriate sentence. The parties may provide any factual information relevant to sentencing to the Probation Office and/or to the Court, without limitation, before or after the completion of the Presentence Investigation Report. The parties agree that the submission of such

information shall not be deemed "advocacy" in violation of any stipulation in this plea agreement.

7. **Supervised Release Term and Conditions:** If the defendant is placed on supervised release, under some circumstances, including the defendant's violation of one or more supervised release conditions, the Court may extend the term of supervised release, and may modify, reduce, or enlarge the conditions of such release.

F. **Other Adverse Consequences:** The following are some examples of the adverse consequences of pleading guilty other than the sentence imposed by the Court, along with any judicial order of forfeiture and/or restitution:

1. Conviction of a felony may result in the loss of civil rights, including, but not limited to, the right to vote and the right to possess firearms.

2. A felony conviction may adversely affect the defendant's ability to hold certain professional licenses and may impair the defendant's ability to do business with federal, state, and local governments or to receive benefits from such governments.

There may be other adverse consequences as well, some of them unforeseeable. It may be difficult or impossible to predict all of the adverse consequences of the defendant's guilty plea. The defendant agrees that any resulting adverse consequences, whether or not foreseen or foreseeable, will not provide a basis for withdrawing from the guilty plea described in this agreement or otherwise challenging the resulting conviction and sentence.

G. **Restitution:**

1. Until all monetary penalties are paid in full, the defendant will be referred to the Treasury Offset Program through the United States Department of Treasury so that any federal payment or transfer of returned property to the defendant will be offset and

applied to pay the defendant's unpaid monetary penalties, regardless of the defendant's payment history.

2. The defendant acknowledges and agrees that if the Court imposes a payment schedule for the payment of any criminal monetary penalty, that payment schedule shall be the minimum payment obligation and shall not be the only method or a limitation on the methods available to the United States to enforce the criminal monetary penalty judgment. Any partial restitution payments made by the defendant do not preclude the government from using any other anticipated or unexpected financial gains, assets or income of the defendant to satisfy the restitution obligation.

3. Until restitution is paid in full, the defendant agrees to a voluntary garnishment of twenty-five percent (25%) of all nonexempt net disposable earnings from any employment, without prior demand under the Federal Debt Collection Procedures Act (28 U.S.C. § 3205). To this end, the defendant waives any exceptions under the Consumer Credit Protection Act (15 U.S.C. § 1673).

4. If the defendant is sentenced to any amount of time in prison, he agrees to participate in the Federal Bureau of Prisons Inmate Financial Responsibility Program to the extent that any criminal monetary penalty remains unpaid while he is incarcerated, regardless of whether the Court specifically directs participation or imposes a schedule of payments.

H. **Forfeiture:** If the defendant has agreed to forfeiture of assets, the defendant agrees to the following terms and conditions:

1. The defendant hereby forfeits, to the United States, all right, title, and interest of any nature in any and all assets that are subject to forfeiture, including substitute assets, as set forth

23

above, whether those assets are in the possession or control of the defendant, a nominee, or some other third party.

2. The defendant consents to the entry of an order of forfeiture of the assets described above.

3. The defendant is aware that pursuant to Rule 32.2(b)(4)(A) of the Federal Rules of Criminal Procedure, a preliminary order of forfeiture becomes final as to a given defendant at sentencing or at any time before sentencing if the defendant consents. The defendant consents that the preliminary order of forfeiture in this case shall become final as to the defendant before sentencing, as of the date the preliminary order of forfeiture is entered by the Court. The defendant understands that the government, upon entry of the preliminary order of forfeiture, will address any potential third party claims pursuant to Rule 32.2(c), and seek to finalize forfeiture.

4. Forfeiture of the defendant's assets will not satisfy all, or any portion of, a fine, restitution, or other monetary penalty that the Court may impose upon the defendant in addition to forfeiture. Satisfaction of all, or any portion of, any restitution, fine, or other penalty that the Court may impose upon the defendant in addition to forfeiture will not satisfy all, or any portion of, any forfeiture judgment ordered by the Court.

5. In the event that any successful claim is made, by any third party, to the assets described above, the defendant agrees to forfeit substitute assets equal in value to the assets transferred to any such third party. The defendant agrees that forfeiture of substitute assets shall not be deemed an alteration of the Defendant's sentence.

6. The defendant agrees to cooperate with the United States by taking whatever steps are necessary to pass clear title to the United States of any forfeitable assets, including but not limited to, surrendering title; completing any documents or legal proceedings required to

transfer assets to the United States; and taking necessary steps to ensure that assets subject to forfeiture are not sold, disbursed, expended, destroyed, damaged, hidden or otherwise made unavailable for forfeiture or removed beyond the jurisdiction of the Court.

7. The defendant waives the right to a jury trial on the forfeiture of assets. The defendant waives all constitutional, legal, and equitable defenses to the forfeiture of assets, as provided by this agreement, in any proceeding, including but not limited to any jeopardy defense or claim of double jeopardy or any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of an excessive fine.

8. The defendant acknowledges that the government may institute civil or administrative proceedings against any or all of the defendant's forfeitable assets, including, but not limited to substitute assets and any forfeitable assets not identified by the defendant, and agrees not to contest any such forfeiture proceedings.

9. The defendant represents and warrants that the defendant has no direct or indirect interest in any property, real or personal, or other asset subject to forfeiture by virtue of this plea agreement, other than those listed above.

10. In the event the government determines that the defendant has breached any condition of this plea agreement, none of the forfeited property shall be returned to the defendant, nor shall the defendant assert any claim to the forfeited property. The defendant shall not reacquire any forfeited property, directly or indirectly, through family members, nominees, friends, or associates.

I. **Determination of Financial Condition and Payment of Financial Obligations Ordered by the Court:**

1. If requested, the defendant will provide any privacy waivers, consents, or releases requested by the United States Attorney's Office to access records to verify the defendant's

25

financial disclosures, and if requested will complete a further financial statement provided by the United States Attorney's Office as well as any supporting financial documentation to the Asset Recovery Unit of the United States Attorney's Office no later than 10 days after receiving such a request. The parties agree that the defendant's failure to timely and accurately complete and sign a financial statement, and any update thereto may, in addition to any other penalty or remedy authorized by law, constitute the defendant's failure to accept responsibility under USSG § 3E1.1.

2. The defendant also agrees to provide or consent to the release of the defendant's tax returns for the previous five years. The defendant understands that assets and financial interests subject to disclosure include assets owned or held directly or indirectly, individually or jointly, in which the defendant has any legal interests, regardless of title, including any interest held or owned under any other name, trusts, and/or business entities presently and since date of the first offense giving rise to this Plea Agreement, or giving rise to the charges presently pending against the defendant, whichever is earlier.

3. The defendant understands that 31 U.S.C. § 3711(h)(1) permits the United States to obtain the defendant's credit report after sentencing and expressly authorizes the United States to obtain the defendant's credit report prior to sentencing in this case. The defendant understands that the United States has sole discretion over whether it will obtain defendant's credit report pursuant to this Plea Agreement. If the United States determines that it will obtain defendant's credit report prior to sentencing pursuant to this Plea Agreement, the defendant authorizes the United States, and the United States agrees, to provide a copy to defense counsel upon request.

4. The defendant shall identify all assets valued at more than $5,000 that have been transferred to third parties since the date of the first offense giving rise to this Plea Agreement, including the location of the assets and the identities of third parties to whom they were transferred. The defendant agrees not to transfer any assets valued at more than $5,000 without approval of the Asset Recovery Unit of the United States Attorney's Office until the fine, forfeiture, and restitution ordered by the Court at sentencing are paid in full or otherwise terminated by operation of law. The defendant agrees to take all steps requested by the United States to obtain from any other parties by any lawful means any records of assets contemplated by this paragraph in which the defendant has or had an interest. Until the fine, forfeiture, and restitution ordered by the Court are paid in full or otherwise terminated by operation of law, the defendant agrees to notify the Asset Recovery Unit of the United States Attorney's Office of a change in address within 30 days of such change. The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by this plea agreement and/or that may be imposed by the Court. In addition, the defendant promises not to make any such transfers in the future.

5. No truthful information that the defendant provides pursuant to defendant's obligations under this paragraph will be used in determining the applicable guideline range, except as provided in Section 1B1.8(b).

6. Nothing in this agreement restricts the Court's or Probation Officer's access to information and records in the possession of the United States. Furthermore, nothing in this agreement prevents the United States in any way from prosecuting the defendant should the defendant knowingly provide false, untruthful, or perjurious information or testimony, or from using

information provided by the defendant in furtherance of any forfeiture action or restitution enforcement action, whether criminal or civil, administrative or judicial.

**J.    Remedies for Breach:**

1.  Should the government determine that the defendant, after the date the defendant has signed this plea agreement, (i) has committed any further crime or violated any condition of release or supervision imposed by the Court (whether or not charged); (ii) has given false, incomplete, or misleading testimony or information; or (iii) has moved to withdraw the defendant's guilty plea for reasons other than those described in this agreement or otherwise has breached any term or condition of this plea agreement or supplemental agreements with the government, the government will have the right, in its sole discretion, to void this agreement, in whole or in part. In the event of such breach, the defendant will remain obligated to plead guilty and otherwise comply with the terms of this agreement and will not be permitted to withdraw the defendant's guilty plea under this agreement. The defendant will be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to charges that this Office has agreed to dismiss or not to prosecute under this agreement.

2.  If the defendant breaches this agreement, the government will have the following remedies, among others, available to it:

    a)  To bring prosecution for any federal criminal offenses dismissed or not prosecuted under this agreement. The defendant waives (gives up) any defense or objection to the commencement of any such prosecution that is not time-barred by the applicable statute of limitations as of the date on which the defendant signed this plea agreement,

notwithstanding the expiration of the statute of limitations between the signing of the agreement and the commencement of any such prosecution.

b) In connection with any such prosecution, any information, statement, and testimony provided by the defendant, and all leads derived therefrom, may be used against the defendant, without limitation and without regard to any rights the defendant may have under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410.

c) To utilize any information, statement, or testimony provided by the defendant in any proceeding, including at sentencing, notwithstanding U.S.S.G. §1B1.8;

d) To advocate if, and how, any particular adjustment or specific offense characteristic affects the applicable Sentencing Guidelines range without regard to any contrary stipulations contained in this agreement;

e) To refrain from making any sentencing-related motion favorable to the defendant without regard to any provision in this agreement obligating the government to consider making or make such motion upon fulfillment of certain conditions;

f) To urge the sentencing Court to take the defendant's breach into account when imposing sentence;

g) To recommend any sentence the government deems appropriate, even if such recommendation is at odds with any stipulation in this agreement.

K. **Limitations:** This agreement is between the United States Attorney's Office for the Northern District of New York and the defendant. References to "the government" in this agreement refer only to that Office. This agreement does not bind any other federal, state, or local prosecuting authorities. Furthermore, this agreement does not prohibit the United States, any agency thereof, or any third party from initiating or prosecuting any civil or administrative

proceedings directly or indirectly involving the defendant, including, but not limited to, proceedings by the Internal Revenue Service relating to potential civil tax liability, proceedings relating to the forfeiture of assets, and proceedings by the Department of Homeland Security, Bureau of Citizenship and Immigration Services relating to the immigration status of the defendant.

L. **Agreement Must be Signed; Modifications Must be Written or on the Record:** This agreement, to become effective, must be signed by all of the parties listed below. No promises, agreements, terms, or conditions other than those set forth in this plea agreement will be effective unless memorialized in writing and signed by all parties or confirmed on the record before the Court.

M. **Agreement to Plead Guilty Voluntary:** The defendant acknowledges reading each of the provisions of this plea agreement with the assistance of counsel and understands its provisions. The defendant further acknowledges that the defendant's agreement to plead guilty is voluntary and did not result from any force, threat, or promises (other than the promises in this plea agreement and any written supplemental agreements or amendments).

JOHN A. SARCONE III
Acting United States Attorney

Joshua R. Rosenthal
Assistant United States Attorney
Bar Roll No. 700730

10/31/25
Date

Kris Roglieri
Defendant

10/31/25
Date

30

10/31/2025
Date

Jeremy B. Sporn
Matthew E. Trainor
Paul E. Shelton
Attorneys for Defendant
Bar Roll Nos. 704243, 105643, 706112