IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:24-CR-392 (MAD) |
| | ) | |
| | ) | |
| **v.** | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| | ) | |
| **KRIS ROGLIERI,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## INTRODUCTION

Kris Roglieri led one of the largest fraud schemes prosecuted in this district, scamming victims across the country out of tens of millions of dollars. Roglieri lied to victim after victim, directly or through co-conspirators Kimberly "Kimmy" Humphrey and Christopher Snyder, about how the victims' multimillion-dollar advanced payments would be used by Roglieri's company to secure loan funding. In reality, Roglieri spent much of that money on himself and to keep his con going. The government respectfully requests that the Court impose a sentence towards the high-ends of the ranges recommended by the United States Sentencing Guidelines. Such a sentence is sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

On November 13, 2025, Roglieri pled guilty pursuant to a plea agreement to conspiracy to commit wire fraud as alleged in the first count of a multi-count superseding indictment. Dkt. ## 82, 90; Nov. 13, 2025 Text Min. Entry. The government adopts the facts as set forth in the initial disclosure of the Presentence Investigation Report dated February 23, 2026, which

incorporates court filings and investigative reports shared with the U.S. Probation Office (Dkt. # 95) (the "Initial PSIR").

As recounted in the Initial PSIR, Roglieri held out his two companies—Prime Capital Ventures, LLC ("Prime Capital") and Prime Commercial Lending, LLC ("Prime Commercial")—as commercial lending businesses.  Initial PSIR ¶ 41.  As part of contractual arrangements with clients located across the country, Prime Capital obtained upfront interest payments from prospective borrowers while it purportedly sought to secure loans for those borrowers.  *Id.*  Prime Capital characterized these upfront interest payments as the "Interest Credit Account Payment" or "ICA" payment.  *Id.* ¶¶ 41-45.  ICA payments were not fees to Prime Capital.  *Id.* ¶ 45.  Instead, each borrower's upfront ICA payment would be debited over time as the loan was funded and accrued more interest.  *Id.*  Roglieri and his co-conspirators promised that ICA payments would be fully refundable if Prime Capital did not secure a loan for the borrower client.  *Id.*  Indeed, as Roglieri explained to one client during a December 2023 video call, "There really isn't any risk. The [ICA] money gets put into a pledged account."  *Id.* ¶ 47.

In truth, because Prime Capital never ultimately secured a source of loan funding, Roglieri and his co-conspirators used millions in ICA payments from newer borrower clients to partially fund loans, or refund ICA payments, to older borrower clients.  *Id.* ¶ 49.  But Roglieri did not stop there.  He also pilfered client ICA payments to pay his personal debts and enrich himself, including by purchasing million-dollar cars, luxury watches and jewelry, and private jet travel.  *Id.*  In late December 2023, as a last hurrah while creditors sought to put Prime Capital into involuntary bankruptcy proceedings, Roglieri, Humphrey, and Snyder obtained a $5 million ICA payment from a final victim.  *Id.* ¶¶ 61-63.  Roglieri then immediately spent that money on

a private jet vacation to Anguilla, an $84,000 Rolex, and to partially fund a loan for a pre-existing Prime Capital client. *Id.* ¶ 63.

After Roglieri indulged in almost unimaginable luxury, his victims suffered. One victim describes their "sleepless nights" and "extreme anxiety" as result of the "horrible situation" created by Roglieri's greed. *Id.* at 40. Another victim says the "emotional burden has been immense" and they have "relentless worry about how [they] will rebuild from this loss at this stage of [their] life." *Id.* at 45. Yet others recount severe damage to their credit and hard-earned professional reputations as result of this scheme. *See, e.g.*, *id.* at 99, 108.

**APPLICABLE STATUTORY AND GUIDELINES PROVISIONS**

## I.    Statutory Maximums

The defendant's conviction for conspiracy to commit wire fraud subjects him to a statutory maximum term of 20 years of imprisonment. 18 U.S.C. §§ 1343, 1349. The defendant's conviction also subjects him to a maximum term of three years of supervised release, *see* 18 U.S.C. § 3583(b)(2), and a maximum fine of $250,000, *see* 18 U.S.C. § 3571(b)(3). A special assessment of $100 must be imposed. 18 U.S.C. § 3013.

## II.    Guidelines Provisions

### a.  Offense Level

The government agrees with the Guidelines computation set forth in the Initial PSIR. The base offense level for the defendant's conspiracy conviction is 7. Initial PSIR ¶ 90. Two specific offense characteristics apply because: (i) the total loss amount exceeded $25 million but was less than $65 million, and (ii) the offense involved 10 or more victims. *Id.* ¶¶ 91-92. This results in a combined upward adjustment of 24 levels. *Id.* The defendant also served as an organizer, leader, manager, or supervisor in the criminal activity, resulting in a two-level

3

enhancement under U.S.S.G. § 3B1.1(c).  *Id.* ¶ 94.  The Zero-Point Offender deduction under U.S.S.G. § 4C1.1 is not applicable due to that aggravating role enhancement.  *Id.* ¶ 99.  The total offense level after acceptance of responsibility credit is therefore 30.  *Id.* ¶ 100.

### b.  Criminal History Category

The government agrees with the U.S. Probation Office's determination that the defendant's criminal history category is I.  Initial PSIR ¶ 108.

### c.  Guidelines Ranges

The Guidelines recommend that the defendant should receive a term of imprisonment in the range of 97 to 121 months.  Initial PSIR ¶ 130.  The Guidelines advise the Court to conduct an individualized assessment concerning the need for and length of any term of supervised release.  *Id.* ¶ 134.  The defendant is not eligible for probation because his Guidelines range is in Zone D of the sentencing table.  *Id.* ¶ 135.  The Guidelines range for a fine in this case is $30,000 to $250,000.  *Id.* ¶ 139.

**GOVERNMENT'S SENTENCING RECOMMENDATION**

Based on all the information before the Court, the government respectfully requests that the Court sentence the defendant to a term of imprisonment towards the high end of 97-to-121-month Guidelines range to be followed by a three-year term of supervised release.[1]  A Guidelines sentence is sufficient, but not greater than necessary, to comply with the sentencing factors in 18 U.S.C. § 3553(a).  Although the Guidelines are no longer mandatory, the Second Circuit has instructed district courts to consider them "faithfully" when sentencing.  *United States v. Crosby*,

---

[1] Given the defendant's anticipated restitution and forfeiture obligations as well as the U.S. Probation Office's finding that he does not appear to have the ability to pay a fine, the government does not request the imposition of a fine here.  *See* Initial PSIR ¶ 128; U.S.S.G. § 5E1.2(a) (fine may be waived where "defendant establishes that he is unable to pay and is not likely to become able to pay any fine").

397 F.3d 103, 114 (2d Cir. 2005). "[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see, e.g.*, *Gall v. United States*, 552 U.S. 38, 46 (2007) (explaining that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Moreover, within-Guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act – "to diminish unwarranted sentencing disparity." *Rita v. United States*, 551 U.S. 338, 354 (2007).

### The Nature, Circumstances, and Seriousness of the Offense

The sentence imposed should reflect the nature and seriousness of the offense, which involves the defendant's scheme to fraudulently obtain tens of millions of dollars with the help of two subordinate co-conspirators. As reflected in the Guidelines enhancements applicable here, at least two aggravating factors—the total loss amount and the number of victims involved—suggest that the defendant's crimes merit a Guidelines sentence. The defendant *personally* obtained more than $55 million in fraud proceeds from victims across the country in less than two years. *See* Initial PSIR ¶¶ 42, 65. To put this staggering sum into perspective, consider that the Chief Executive Officers of McDonald's and Mercedes Benz, two legitimate businesses, were paid $19.2 million and $13.9 million respectively in 2023. *See* Jonathan Maze, *McDonald's CEO Chris Kempczinski Got a Raise Last Year*, Restaurant Business (Apr. 3, 2024), *available at* https://www.restaurantbusinessonline.com/financing/mcdonalds-ceo-chris-kempczinski-got-raise-last-year; Reuters, *Mercedes CEO nearly doubled 2023 Remuneration with Big Bonus Boost*, Reuters Online (Mar. 15, 2024), *available at* https://www.reuters.com/business/autos-transportation/mercedes-ceo-almost-doubled-2023-

5

remuneration-with-big-bonus-boost-2024-03-15/.  Meanwhile, the U.S. Census Bureau reported that the median income of an American household in 2023 was about $80,610.  U.S. Census Bureau, *Income in the United States: 2023* (Sept. 10, 2024), *available at* https://www.census.gov/library/publications/2024/demo/p60-282.html.    As the defendant admitted in his plea agreement, this money was used for a host of extravagant purchases, including luxury watches by Rolex and Richard Mille, three Ferraris (as well as a Ferrari engine coffee table that cost more than $260,000), a Porsche, a Maserati, and seven Mercedes Benz vehicles.  *See* Plea Agreement ¶¶ 1(e), 5(q).  A significant sentence is needed to reflect the magnitude of the loss here.

Beyond the scope, number of victims, and amount of money involved, the seriousness of this offense is reflected in its impact on the victims.  While one can view the victims as sophisticated players, Roglieri's crimes caused substantial damage to the victims besides their loss of money.  Understandably, the victims describe being inflicted with sleepless nights and anxiety.  Initial PSIR at 40, 45.  They have suffered severe damage to their credit and professional reputations due to Roglieri's relentless greed.  *See, e.g.*, *id.* at 99, 108.  Roglieri's sentence must reflect the immense intangible damage that he caused to these victims.

Finally, while the government does not contest the application of acceptance of responsibility credit under U.S.S.G. § 3B1.1(a)-(b), the letter submitted by the defense at Paragraph 88 of the Initial PSIR purporting to put the defendant's actions in a "larger context" needs some context of its own.  Stripped of its gloss, the defense's letter suggests that Roglieri's loss of $20 million in victim funds to an unrelated scam exacerbated the losses suffered in this case because Roglieri thought that he would receive enough back to cover Prime Capital's obligations.  But even if credited, the defense's letter does not excuse Roglieri's conduct.  For

6

instance, the letter talks about Roglieri signing the agreement that would ultimately lead to his paying that $20 million in October 2022.  By September 2022, Roglieri had already convinced victim Onward Partners to give him a $20 million ICA payment, which he then used in part to fund a prior counterparty called Indigo Pharmaceuticals.  *See* Initial PSIR ¶¶ 48, 51.  When Onward confronted Roglieri about his litigation with one of those parties, he falsely told them "[f]or clarification the matter with [that third-party] in which we are the plaintiff has *nothing to do with your ICA*[.]"  Ex. A at 1 (emphasis added).  And more to the point, nothing in the defense's letter explains how Roglieri could have thought it was permissible to use tens of millions of dollars in client ICA funds on himself for cars, watches, and vacations.  All told, the defense's letter presents limited, if any, mitigating value.

### Respect for the Law, Just Punishment, the Defendant's History, and Deterrence

A Guideline term of imprisonment will also promote respect for the law, provide just punishment, and further the goals of specific deterrence to the defendant and general deterrence to others.  18 U.S.C. § 3553(a)(2).  It will also reflect Roglieri's history and characteristics.  18 U.S.C. § 3553(a)(1).

While the government acknowledges that Roglieri is a first-time offender, in fraud cases it is critical that the sentence imposed send a strong message not only to the instant defendant but also to all would-be fraudsters that this type of misconduct will be met with serious consequences.  The defendant, and others like him, should be deterred from thinking that they can defraud with impunity.  Indeed, as numerous U.S. Courts of Appeals have recognized, "[b]ecause economic and fraud-based crimes"—like those committed by the defendant here— "'are more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'"  *United States v. Martin*, 455 F.3d 1227,

1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)); *see also, e.g.*, *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting that the "deterrence of white-collar crime" is "of central concern to Congress"); *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) ("Congress has recognized that general deterrence is particularly important in the context of white collar crime").

Roglieri was undoubtedly involved in helping the less fortunate through charitable acts and supporting his family and friends *before* the specter of criminal charges came about. The government acknowledges that this is a mitigating factor. Nonetheless, information obtained in the investigation shows that the defendant was often consumed by his desire for wealth and depravity. The photos attached to this submission as Exhibit B underscore this point and demonstrate the defendant's need for rehabilitation.[2]

### Forfeiture

The government also seeks to forfeit a money judgment for the unlawful proceeds obtained through the defendant's fraud scheme, as outlined in the preliminary order of forfeiture. *See* Dkt. # 96. As required by Federal Rule of Criminal Procedure 32.2(b)(4)(B), the government respectfully requests that the Court include the forfeiture when orally pronouncing the sentence and in the judgment.

\*     \*     \*

---

[2] This Court's sentence should be run at least partially consecutively to any future sentence imposed in connection with the defendant's pending state weapons charges because the fraud here is entirely separate from the defendant's illegal possession of weapons. *See* U.S.S.G. § 5G1.3(d).

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to terms of imprisonment and supervised release towards the high ends of the applicable Guidelines ranges.[3]

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>Dated: March 16, 2026</td><td>TODD BLANCHE<br>Deputy Attorney General</td></tr>
<tr><td></td><td>JOHN A. SARCONE III<br>First Assistant United States Attorney</td></tr>
<tr><td>By:</td><td>*/s/ Joshua R. Rosenthal*<br>Joshua R. Rosenthal<br>Assistant United States Attorney<br>Bar Roll No. 700730</td></tr>
</table>

---

[3] The government reserves the right to respond to defense arguments raised after filing of this memorandum.  Similarly, if the Court is considering a *sua sponte* departure from the applicable Guidelines range on a ground not previously identified by the parties or in the PSIR, the parties are entitled to notice and an opportunity to respond.  Fed R. Crim. P. 32(i)(1)(c), (h).  Further, the government respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the Probation Office.