UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Case No. 24-cr-392-MAD |
| | ) | |
| **KRIS ROGLIERI,** | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

### Introduction

Prime Capitol Ventures was not founded with criminal intent. It was a business model that had not been tried frequently before, if at all. With good reason, it turned out. But Mr. Roglieri did not know of its failures at the time of its conception, or that it was, in his words now, "doomed from inception." Letter from Kris Roglieri, in attached Character Reference Letters. He believed that he could leverage a borrower's initial payment [the ICA] into a much larger funding reservoir based on access to private trading platforms and lucrative investment strategies. The success of the business model very much depended on the success of that investment. He would not have believed that he, himself would be defrauded, falling victim to a classic pattern of private placement fraud that the FBI has warned investors about for years. Many people of course do not believe that, until it happens to them. Obviously, if he had, he would not have transferred borrower money to Reign Financial ["Reign"] and Berone Capital ["Berone"], a financial institution and hedge fund that were setting him up from the beginning. For them, he was never more than a mark, but the same cannot be said for Mr. Roglieri and the borrowers. He wanted them to achieve success, and to make money for his business. Certainly there was room for both objectives.

1

As a fraud, this was unusual in that his goal was to provide borrowers with funding.  In other words, he wanted to give them money or provide them with capital.  We acknowledge that they would not have entered into lending agreements with Prime had they known that he did not, in fact, have the capital to fund their loans or that their ICA payments would be used in turn to fund the loans of other borrowers.  But even that species of fraud comes close to the "right to control" theories that the Supreme Court has rejected in *Ciminelli v. United States*, 598 U.S. 306 (2023).  Regardless, there was a legally cognizable fraud, Mr. Roglieri has admitted it, and has accepted responsibility.

As a culture, we reward risk, optimism and entrepreneurial spirit, and lionize business leaders who employ such strategies.  Some of the biggest celebrities in our celebrity-obsessed culture are nothing more than successful businesspersons or glorified salesmen.  Mr. Roglieri thought himself one, and for much of his adult life, he was one.  He was generous.  He was charitable and evolved into a pillar of the community.  He had a track record of success in commercial lending and loan brokering and otherwise for nearly 20 years, unsullied by the type of allegations and lawsuits that arose of this case.  He lived a good life, and rewarded himself financially, but commensurate with his record of success.  He continued to do so into the life of this conspiracy, and plainly got carried away, spending money that was not yet his to spend on more automobiles, watches and other luxury items and services.   And it all ended badly – for him and everyone else.  His fall from grace has been long and hard, painful for both himself and his family.  But the inevitable result of that misconduct does not necessarily require that Mr. Roglieri must be warehoused in a federal prison for years and years, or decades.

Kris Roglieri respectfully submits this memorandum in aid of sentencing, scheduled for April 3.  As that happens to fall on Good Friday, it is an opportunity for a sort of rebirth, a resurrection from the ashes of a bankruptcy, failed business and wire fraud conspiracy.  Mr. Roglieri

began that journey by accepting responsibility and pleading guilty in November 2025 pursuant to an agreement with the Government.  Still, there is more penance.  Based upon an enhancement in dispute[1], the PSR calculates an advisory Guidelines range of 97-121 months.  If the enhancement did not apply, Mr. Roglieri would be eligible for the "zero point offender" adjustment, and the Guideline range would fall to 51-63 months, which is the defense's view of the proper calculation. For the following reasons, he asks this Court to sentence him to a term between 4 and 6 years, generally in line with the Guidelines under that lowered range.  A sentence in line with the Government's request or the higher Guideline range of 97-121 months is greater than necessary to achieve the purposes of sentencing enumerated under Section 3553(a).

#### The Offense Conduct is Intertwined with Roglieri Being Defrauded

The factual basis in the plea agreement, and the PSR itself amply cover the relevant facts, including as to Prime Capital Ventures' transactions and communications with its borrower clients. Nothing herein should be construed to negate or undercut any of those facts or the story they tell. However, there is a larger context to the commission of the offense conduct that explains why and how the fraud occurred.  It did not occur in a vacuum, and the following backdrop supplements the factual basis in the plea agreement, and yields a more comprehensive, richer understanding of what occurred and why.

As an entrepreneur, and after becoming a successful commercial lender and loan broker, it was not unusual that Mr. Roglieri would have created a new business entity, Prime Capital Ventures, to serve a different niche.  This was not Mr. Roglieri's first foray into direct lending, and Prime Commercial Lending had previously borrowed money from banks to successfully and legitimately

---

[1] Mr. Roglieri's objections to the PSR and the disputed enhancement, as well as information on purported threats, were communicated to the Probation Office on March 9, 2026.  Rather than restate or expand upon them here, we incorporate those objections, in the event the disputed information appears in the final PSR.

fund borrowers, albeit on a smaller scale. The genesis of PCV coincided with access, on Mr. Roglieri's part, to large amounts of potential funding through private placement commercial transactions and lucrative investment opportunities presented to him.  First it was a contact of Ms. Humphrey's, Will Byrd, who offered access to large scale investment funding, in 2021.  When that fell through, Mr. Roglieri contacted Gary Mills, who had previously enrolled in Mr. Roglieri's training course and who was promoting private placement investment opportunities on LinkedIn.

Kris hoped to use this reservoir of money, and the way in which it was proposed to him that he could leverage funds, to lend large amounts of money to borrowers on commercial development projects, and on a larger scale than he had been doing at Prime Commercial Lending.  This tended to focus on commercial real estate and construction loans.  The financial structure of the loan agreements involved so-called ICA [Interest Credit Account] payments, which were essentially intended to serve as pre-payment interest through the life of the loan.  This would serve as a credit on PCV's books for the borrower, as set out in Attached Exhibit A:

4



66 South Pearl Street
10th Floor
Albany, NY 12207

**STATEMENT OF ACCOUNT**

| | | |
|---|---|---|
| Account Number: | 461-110-000 | |
| Statement Date: | 06/29/2023 | Page  1  of  1 |
| Period Covered: | 05/01/2023 to 05/31/2023 | |

HCW Biologics Inc.
2929 N. Commerce Parkway
Miramar, FL 33025

| | |
|---|---|
| Opening Balance: | 0.00 |
| Total Credit Amount: | $5,250,000.00 |
| Total Debit Amount: | 0.00 |
| Current Balance: | $5,250,000.00 |
| Account Type: | Current Account |
| Number of Transactions: | 1 |

Transactions

| Date | Description | Credit | Debit | Balance |
|---|---|---|---|---|
| 05/01/2023 | ICA Payment | 5,250,000.00 | | $5,250,000.00 |
| | --- End of Transactions --- | | | **$5,250,000.00** |

USAO_ROGLIERI-00003004

In turn, the ability to leverage those funds corresponded to the business model. While the narrative in this case took shape that ICA payments were untouchable, the reality was more complex. Indeed, Prime Capital Ventures advertised on its website [Exhibit B], seen below, that it would leverage the ICA deposit – which would seem to contradict the later notion that such funds would never leave the account in which they were deposited:



As mentioned, the success of PCV's business model depended on access to the kinds of returns that were promised to him in his discussions and eventual contractual agreements with the two financial entities involved – Reign Financial and Berone Capital Partners. Reign would execute trades or other investment activity through an account held in PCV's name at Berone Capital, a newer hedge fund registered with the Securities and Exchange Commission. In order to generate the type of funding contemplated, Mr. Roglieri was told that $20 million was a minimum threshold

amount that Reign/Berone required to access their trading platform. Getting to $20 million was thus the goal, and while agreements were ultimately signed in September and October 2022 [attached as Exhibits C & D], the lead up lasted for months and months.

Further, that those funds, the initial $20 million and others thereafter would be placed with a hedge fund subject to SEC regulation gave Mr. Roglieri a degree of assurance that he otherwise would have lacked with a fly-by-night operation. Mr. Roglieri was provided additional assurances as to the third-party administrators, referenced in the contracts, that would provide another layer of oversight to protect his investment, as well as other assurances about the security of the $20 million and its quick return to him if the investment transaction failed. Exhibits E[2] & F. Officials at both Reign and Berone confirmed that the money would not move out of PCV's account, as is also set forth in the contracts. Exhibit G.

Despite his confidence, Mr. Roglieri nevertheless declined an auxiliary or additional investment proposal for between $5-10 million, involving a separate entity called Quattro Capital, headed by a Nick Del Franco, when Reign principals had approached him about such a deal in October 2022. Exhibit H. Mr. Roglieri declined this offer of a purported bridge loan, citing in an email [Exhibit I] his discomfort with the supporting paperwork and the proposed involvement of Martin Karo, an escrow attorney in Pennsylvania, whom he distrusted:

From: kris@primecommerciallending.com <kris@primecommerciallending.com>
Sent: Thursday, October 6, 2022 10:36 AM
To: 'Frank Fosco' <frank@greenkrystals.com>; 'Giorgio Johnson' <giorgio@reignccgroup.com>
Cc: gary@reignccgroup.com; 'Martin Karo' <martin.karo@verizon.net>;
johnmarkeai@gmail.com  Subject: RE: EMAIL (2) of (2) THE 200MM LOAN DOCUMENTS - 200MM LOAN

Good morning Frank,

---

[2] The handwriting and highlighting that appears on various emails and other documents attached hereto, belongs, to our knowledge, to Ms. Humphrey and was maintained by her, later turned over in discovery to Mr. Roglieri's defense team. Also, the "Defendant's Exhibit" stickers on various exhibits attached hereto was prepared for purposes of a meeting with the Government, and we do not rely on that numbering scheme herein.

Thank you for presenting this opportunity. We are going to have to pass on this as its presented to us for numerous reasons of which I will outline a few but certainly not all. Please don't take this as personal but merely our observations and due diligence at first glance.

There is a lack of attention to detail all throughout the agreements not to mention numerous misspellings and grammatical errors including your own address whereby it should say "Orange County" but states "Orange Country". This coupled with the fact that there is a very very very basic elementary style 18 page loan agreement for a 200 Million dollar transaction of which there is little to no visibility on Quattro Capital including its principles along with a tainted past lawsuit with the escrow attorney and Quattro's principle which indicates a prior business relationship.

The second aspect of this is we requested changes to several things in the documents of which you agreed to and after two attempted revisions that you sent to us most of the verbiage we pointed out to change has still not been changed. This is a red flag to us whether its intentional or lack of detail.

1. It still mentions our deposit will be sent to lender in your escrow agreement and loan agreement.
2. Martin Karo is still listed on these agreements
3. Incorrect dollar amounts
4. Agent does not hold a insurance policy covering our deposit.

Furthermore, in the loan agreement in section 2.1 Escrow: This section totally undermines everything we were told and led to believe with regards to our position in this transaction. In this section it states the following: *The parties agree to establish a dual escrow account with First Choice Legal Group (Frank M. Fosco Jr.) ("Escrow Agent"), with the transaction assisted and overseen by the Escrow Attorney, Martin Karo Esq.* One could interrupt that Martin supersedes you as escrow agent in the loan agreement. Further down in the this section it makes no mention of the "collateral" being returned to us and it implies that the collateral would be sent to the lender which supports what your escrow agreement states even after we asked you and you agreed to change this. We are not even a party to signatory on the loan agreement. This creates an obvious problem for us if we were to do this.

**The icing on the cake that makes me question everybody in listed in this transaction is**

**section 2. Security: <span style="color:red">There shall be cash described as a collateral amount equal to $40,620,000 hereinafter known as the "Security," which shall transfer to the possession and ownership of Lender IMMEDIATELY pursuant to Section 6(a)</span> of this Note. The Security may not be sold or transferred without Lender's consent until the Due Date. If Borrower breaches this provision, Lender may declare all sums due under this Note immediately due and payable, unless prohibited by applicable law. Lender shall have the sole-option to accept the Security as full-payment for the Borrowed Money without further liabilities or obligations. If the market value of the Security does not exceed the Borrowed Money, Borrower shall remain liable for the balance due while accruing interest at the maximum rate allowed by law.**

Frank, please see the above verbiage in red. Our money in deed moves under the loan agreement which is governed by Martin Karo who has his home address listed in documents and uses a Verizon

8

email address. Like in all your agreements there a several things that contradict each other. We encountered this verbally on what was told to us or in writing in these agreements which is a red flag to us.

The only way I would feel comfortable using my funds to support this transaction is to use a real legitimate law firm for escrow that has insurance up to 1Billion to over escrow, Barclay Damon. https://www.barclaydamon.com/

Outside of that option we will have to take a pass on this.

Regards,

Kris D. Roglieri
Prime Commercial
Lending
www.PrimeCommer
cialLending.com 66
South Pearl Street
10th floor Albany, NY
12207
Office: 866-708-4755
Fax: 518-677-1071

Mr. Roglieri wanted, in effect, nothing to do with Karo, and with good reason, not just because of what occurred in this case, but evidently in others, as an attorney later contacted the prosecutors in this case to make them aware of other allegations lodged against Karo and similar actors.  Attached Exhibit J.

Prime Capital thus entered into two contracts with Reign.  One was a joint venture agreement, which involved splitting the funds generated by Prime's investment, and a second purported "trade agreement" governing Prime's investment. Attached as Exhibits C & D.  The joint venture agreement contains, in retrospect, the precise language in private placement fraud programs, using the same or similar buzzwords such as a Swift MT 799 [an inter-bank confirmation of the presence of funds in particular accounts], or a description of a private commercial financial transaction as "the program".  Exhibit C.  It has many of the hallmarks of fraud, although Mr. Roglieri was unable to see this until much later on.

For example, the Joint Venture agreement [Exhibit C] contains the following language:

1.2. REIGN FINANCIAL INTERNATIONAL, INC. (herein "RFI") is ready, willing, and able to facilitate and assist in the process of entering such funds into an investment structure or facilitate a private placement investment opportunity, upon compliance requirements being met, of the private or commercial banking and business resources being facilitated;

1.4. It is further resolved that **Reign Financial International, Inc.,** and/or Its Affiliate et. al., is hereby authorized to enter into Private Placement contracts, after VENTURER has funded their account at the hedge fund, under RFI'S name to facilitate and assist in the process of entering into an investment structure or facilitate a private placement investment oppo1tunity, upon compliance requirements being met, of the private or commercial banking and business resources being facilitated to accomplish the objective(s) as stated herein and to give irrevocable instructions to said bank(s) on our behalf. This shall not authorize Reign Financial International, Inc., and/or Its Affiliate et. al. to invade, deplete or transfer any funds from our current bank/brokerage/hedge fund account or give our current bank/brokerage/hedge fund any instruction to take these actions.

This includes the notable restriction that prevents Reign from depleting funds from Prime's account, although now it appears that was the very objective of its machinations. The Trade Agreement [Exhibit D] contains a similar restriction that does not authorize Berone to withdraw PCV assets:

2.1.7.    This Agreement will be provided to Berone and serve as instructions from **PCV** to Berone that Berone is authorized to work with RFI to allow RFI to enter the proposed program. However, this shall not authorize Berone to allow any of **PCV's** principal to be withdrawn or directly used for any transaction outside of Berone. **PCV** also authorizes Berone to prevent RBC Capital Markets from closing the account of **PCV** during the duration of the program term

Elsewhere, the joint venture agreement [Exhibit C] contains the following clauses:

programs). If the *VENTURER* so chooses, then the asset amount described previously will be entered into a 40-week program with a determined weekly or monthly yield will be determined by the Private Placement Program. This shall to all Rolls and Extensions as well as the initial contracts with any Private Placement Program.

The trade agreement [Exhibit D], meanwhile, contains the same type of dubious language:

**PCV** wishes to participate in a financial private commercial transaction (hereinafter referred to as "Programs" or a "Program") and has made available cash funds in the amount of **$20,000,000.00 Dollars (Twenty Million US Dollars),** to be sent in United States Dollar equivalent, and wishes to transfer said funds to a new account created for

10

**PCV,** in their name, at a hedge fund described herein. The funds are acknowledged, by **PCV** as being clean, clear, fully transferable, unencumbered, legally earned, as the initial investment capital, (hereinafter referred to as the "Investment Capital"); and

2.1.3.    Execute new account documents sent to **PCV** by the hedge fund, Berone Capital Fund, L.P. to create the account for **PCV** at Berone. **PCV** will receive an online account login from the third-party administrator for the hedge fund that allows **PCV** to view their account at Berone, via online access; and

The signed trade agreement [Exhibit D; see also Exhibit G] with Reign references rates of return or multipliers that PCV would receive once investment proceeds were generated:

3.4.2    **Disbursement Schedule:**

| | |
|---|---|
| A) 10 monthly payments will begin as per the timing stated above in Section 2.3 and if it is possible to make the payment more frequently, best efforts will be made to do so with a smaller amount paid weekly to equal the monthly payment amount: | (*) $20,000,000.00 Dollars (Twenty Million US Dollars) equals gross proceeds {GP}, that will be used for the benefit of **PCV** and rolled into "B" below. |
| B)  **PCV's** gross proceeds (GP) are deemed to be placed into the 40-week trade program and paid as stated above: | 300% of (GP) per month gross before deductions per Joint Venture Agreement dated September 28, 2022, under Investor Transaction Code: PCV-RFI-20M-092022, to be disbursed after each active week of the program.  This is to be paid monthly, but if it is possible to pay on a weekly basis, such weekly payment would be 75% of (GP) per week, subject to the above. |

Thus, on the basis of the initial $20 million transferred to Berone, this would generate upwards of $500 million through the year, which Prime could then lend out to borrowers.  PCV ended up wiring the $20 million to Reign/Berone around October 21, 2022.

Mr. Roglieri was provided a password for a third-party verification and monitoring system, as stated in their agreement with Reign.  Exhibit F.  But nothing of what was promised as to Reign's "program" was effectuated.  Instead, most of the $20 million was wired within days to Martin Karo, the escrow attorney referenced earlier who had no legitimate role in this transaction at all, and much was then transferred back to Berone-controlled accounts[3].  Exhibit K.  Karo appeared to send much

---

[3] Berone's expenditures with Prime's money included purchasing luxury cars, basketball tickets, airfare and travel and more.  While it does not pass unnoticed that there are some surface

11

of the money he received from Berone to Nick Del Franco, the CEO and signatory for Quattro Capital from the bridge loan that Mr. Roglieri had earlier declined. Berone, meanwhile, received checks in the guise of "commission" from the Del Franco-controlled entity, Quattro Capital. *Id.* This was only discovered well after the fact, in late January 2024 or thereafter. But there is no legitimate justification for these transfers, which not only involved people and entities Mr. Roglieri wanted nothing to do with, and expressly stated as much, but also is the exact type of asset depletion that the relevant contracts did not permit.

The contemplated returns never having materialized and after having asked for his money back, Mr. Roglieri and PCV ended up suing Reign and its principals in February 2023. Exhibit L. This was after Mills had started proposing various alternatives to bridge the gap, in late-2022. Exhibit M. The lawsuit against Reign initially sounded in breach of contract and conversion, but not in fraud, as Mr. Roglieri did not then believe or understand that he had, in fact, been defrauded. At the time, it was simply a bad business deal, but one that could be fixed by the funding alternatives that Berone principals regularly promised throughout 2023 as an acceptable solution to the shortfall. Exhibits N, O & P. Further, Mr. Roglieri did not view the Berone principals as the entity that had defrauded him, even as PCV amended their complaint against Reign and its principals to allege a fraud claim. The effect of this lawsuit, however, was only to firm up Berone's deception over the ensuing year.

PCV and Mr. Roglieri were informed by Berone, falsely as it were, that Reign was able to secure a line of credit based on having collateralized Prime's $20 million through an account at RBC.

_____

similarities to Mr. Roglieri's own misconduct, the key difference is that Berone never intended to invest Prime's money as promised, while Kris attempted to use the ICA funds to obtain more leverage and generate more funding for borrowers. It got out of hand, but was not rotten from the outset. From this vantage point, it is somewhat ironic that Kris is pending sentencing and has been jailed since May 2024, while the principals of Berone and Reign remain at liberty and, to our knowledge, uncharged.

Exhibit Q, N (at 1, 2, 5) & O (at 4, 8, 9).  But Mr. Roglieri never authorized or was aware the funds would be used in that manner, and they were transferred without his consent, and contrary to the contractual language above.  The bank records in Exhibit K debunk the explanation Berone offered Mr. Roglieri.  The notion that Berone lent Reign $12 million via a credit line through RBC – the explanation they provided to Mr. Roglieri - is false, and there is no record of any legitimate loan from Berone to Reign.  Berone's management falsely gave the impression that Reign had misled them as well through the collateralization of PCV's $20 million, and taken actions with PCV's money that they were not aware of.  Mr. Roglieri and Prime were thus defrauded by both entities, believed to be working in concert, although Kris did not realize their collusion until much later on.

Berone, meanwhile, cancelled the third-party verification system, and informed Mr. Roglieri that instead, they would be sending him account statements reflecting the presence of $20 million in the account, while also searching for a new third-party vendor to verify the account.  Thus, for months and on a regular basis, Berone would send to Mr. Roglieri and Ms. Humphrey purported account statements like the following, falsely showing that the $20 million safely remained in their account.  Exhibits R (emails sent to PCV with attachments) & S (collecting the false account statements from 2022-2023).

*Fake Account Statement Sent to Mr. Roglieri*



Mr. Roglieri took these account statements at face value, at least reassured that the money was safe and accounted for, and not knowing that the almost all of the $20 million had already been taken out of his account and provided to Martin Karo and others. To date, we believe the vast majority of the $20 million – which should go towards restitution or forfeiture obligations -remains unaccounted for. The actual account statements [Exhibit T, collecting statements from 2022-2023] that the Government eventually received and provided in discovery in this case make this clear, although Mr. Roglieri would not have seen them until well after the fact. This also explains Berone's cryptic communications in December 2023 when it sought to "withdraw" what was referred to as "inaccurate client statements." Exhibit T-1.

14

*Actual Account Statement Obtained by Government Subpoena of Berone Bank Records*



Berone repeatedly assured Mr. Roglieri throughout 2023 (even into 2024) that it would come up with alternative solutions to provide PCV with sufficient capital to fund loan agreements. These avenues [Exhibits N, O, and P] included, for example, access to a trading platform through IBKR, investment models to produce significant lines of credit, and other strategies that would yield returns (a multiplier) as much as much as six times the initial investment[4]:

---

[4] This text message string is composed of Chris Snyder and Prime's counsel in blue on the left, while Mr. Roglieri is green, on the right. The "Jeremiah" that Mr. Snyder refers to is Jeremiah Beguesse, one of Berone's principals who was in frequent contact with Mr. Roglieri, Mr. Snyder and Ms. Humphrey. Many of the other text message strings in the attached exhibits contain some permutation of these participants, along with Ms. Humphrey and Fabian Stone, the other Berone principal, as well as Gary Mills, one of Reign's principals.

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15188529933 _$!<Other>!$_ | | 4/3/2023 10:14:21 PM(UTC+0) | |

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db : 0x14FBDCC (Table: message, handle; Size: 117440512 bytes)

From: +17574129395 Chris Snyder

To: +15188529933 _$!<Other>!$_ (owner)

Talked w Jeremiah.  No trades were done today bc they were on a delay. It'll be fixed by tomorrow morning.  So he'll start trading tomorrow.

Also, it looks like 6X leverage starts tomorrow

**Status:** Read

4/3/2023 10:08:34 PM(UTC+0)

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15188529933 _$!<Other>!$_ | | 4/3/2023 10:14:21 PM(UTC +0) | |

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db : 0x14FAA3A (Table: message, handle; Size: 117440512 bytes)

From: +17573198954 Greg C

To: +15188529933 _$!<Other>!$_ (owner)

That's sick!!!!!

**Status:** Read

4/3/2023 10:09:41 PM(UTC+0)

16

> From: +15188529933 _$!<Other>!$_ (owner)
>
> Wow 6x
>
> **Status:** Sent
>
> 4/3/2023 10:15:25 PM(UTC+0)

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db :
0x14FA7E3 (Table: message; Size: 117440512 bytes)

> From: +15188529933 _$!<Other>!$_ (owner)
>
> So that's 30
>
> **Status:** Sent
>
> 4/3/2023 10:15:33 PM(UTC+0)

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db :
0x14FA575 (Table: message; Size: 117440512 bytes)

Exhibit P, at 3-4.

Mr. Roglieri was duped and lied to from the beginning, and then strung along for an entire year with one false promise after another involving different strategies and investment models. Exhibits N, O & P.  These promises extended even into 2024 to the very end, following the involuntary bankruptcy petition, with Berone continually deceiving him by promising Mr. Roglieri models on new investment strategies into January 2024.  Attached Exhibit U.  These efforts to continually mislead Mr. Roglieri and Ms. Humphrey are documented in numerous emails and text messages provided in discovery and included herein[5].  Exhibits N, O & P. At the time, Mr. Roglieri believed in the viability of these alternatives and Berone's explanations, still not suspecting that their principals had defrauded him and colluded with Reign and Martin Karo. Mr. Roglieri continued to rely on those promises, and continued to accept ICA payments as if PCV had the funding already lined up to consummate lending agreements collectively into the hundreds of millions of dollars.

---

[5] We ask the Court's indulgence in reviewing e-mails, text messages and more, many of which are substantially similar.  One or two might make the point, but the volume of deceptive communications illustrates how extensive, pervasive and coordinated were the efforts at deceiving Mr. Roglieri for well over one year.

17

This was not only bad business and wrong on his part, it was also criminal.  We accept that being defrauded is not a defense to, or a license to defraud others in turn.  But it is an important part of the story.  Accepting and soliciting money under false pretenses, but with the expectation that he would be able to access a large reservoir of capital to make things right and properly fund loans is a different animal than simply stealing other people's money outright, and with no interest or ability in ever making good on your promises or funding agreements.

Mr. Roglieri met voluntarily with the FBI in the Southern District in November/December 2023, along with his then-counsel (in the civil action) to discuss his interactions with the Reign and Berone principals.  He clearly did not have to submit to such an interview, which was memorialized in an FBI 302.  The FBI viewed him – accurately – as a victim of Reign's/Berone's machinations, although he did not believe at the time that Berone had defrauded him and was continuing to do so.  That 302 was produced subject to a protective order, so we do not include it or excerpt it herein, but can make arrangements to provide to the Court with the Government's consent.  Obviously that does not absolve him of liability, but it establishes that he has been saying the same thing (to the extent his existing knowledge permitted) about these interactions since before he was charged.

Mr. Roglieri did not put the pieces together until it was too late – long after the FBI investigation began, and only once he received and reviewed discovery in a civil suit.  Text messages to both his wife and lawyer in January 2024 evidence his surprise at getting scammed.  Exhibit V.  Even that realization was limited, however, and only became complete once he received and reviewed discovery in this criminal case.  In retrospect, but only with the provision of discovery in 2024 starting in a civil lawsuit and continuing through Rule 16 discovery in this case, Mr. Roglieri was able to see with clarity what he did not at the time – that Reign/Berone had perpetrated the

exact type of private placement fraud that the FBI has warned[6] investors about [Exhibit W] for over

a decade, with many of the same terminology below appearing throughout the joint venture and

trade agreement in Exhibits C & D:

January 5, 2015

# FBI Warns Public About Platform Trading Investment Scams

Paul D. Delacourt, Special Agent in Charge of the Honolulu Office of the Federal Bureau of Investigation (FBI), is warning the public about fraudulent activity commonly referred to as Platform Trading, Private Platform Programs (PPPs), Prime Bank Trading, or Medium-Term Note Trading Programs. In these schemes, perpetrators falsely represent their ability to offer above-average market returns with below-market risk through the trading of bank instruments. Offering such programs, or claiming to have connections to such programs, violates numerous federal criminal laws.

The FBI has participated in numerous investigations of persons promoting Platform Trading investment schemes and noted several common characteristics, including:

- Claims that investor funds can be placed in a bank account and then used, without risk, to trade bank debentures or other financial instruments;
- Claims that invested funds can be used to lease or rent U.S. Treasury Obligations and then use these same leased securities as collateral for further trading programs;
- Claims that trading Medium Term Notes (MTNs), Prime Bank Notes, or any other bank instruments, on a riskless basis, will yield above market returns;
- Claims that Letters of Credit or Standby Letters of Credit can be discounted or traded for profits;
- Claims that certain high-yield foreign trading programs are sanctioned or supported by the Federal Reserve, International Monetary Fund, International Chamber of Commerce, or other U.S. or international agencies;
- Claims about special connections to the Federal Reserve or some other internationally renowned organization such as the United Nations, the IMF or the World Bank;
- Claims of ties to benevolent, humanitarian, or charitable projects;
- The need for extreme secrecy and nondisclosure agreements;
- Claims that banking and regulatory officials will deny knowledge of such instruments;
- Claims that these investment opportunities are by invitation only, available to only a handful of special customers, and historically reserved for the wealthy elite;

---

[6] *See also* Billion Dollar Investment Fraud, Dec.6, 2013, available at https://www.fbi.gov/news/stories/billion-dollar-investment-fraud1.

- Claims that the financial instruments are too technical or complex for non-experts to understand.

In general, investment programs that purport to offer an introduction to secret investment markets, which offer above-market rates of return with below-market rates of risk for privileged customers with special access, are fraudulent. There are no secret markets in Europe or in North America in which banks trade securities. Any representations to the contrary are fraudulent.

Some phrases are commonly seen in documents presented by fraudsters in the course of Platform trading schemes. If any of these phrases appear in documentation, the investment opportunity should be treated with suspicion. These "red-flags of investment fraud" include:

- Non-circumvention, non-disclosure
- Good, clean, clear, and of non-criminal origin
- Blocked Funds Investment Program
- Private Placement Program
- Prime Bank Trading Program
- Medium-Term, Mid-Term, or Seasoned Note Trading Program or Platform
- Federal Reserve approved
- Roll Program
- Irrevocable Pay Orders
- Unconditional Bank Guarantee
- Prime Bank Notes, Guarantees, Letters of Credit, Standby Letters of Credit
- Fresh-cut paper
- Top 100, 50, 25, 10, etc. European/World Banks
- Trading Platform or Platform Trading Program
- Insurance Wrap protecting investment value
- Paymaster who handles funds disbursement
- Exit-buyer

As noted above, the marketing of fraudulent investment schemes violates many federal and state criminal laws. Anyone with information regarding persons offering these Platform Trading investments should contact their local FBI field office.

Again, we do not highlight these issues to serve as an excuse, and certainly not as a defense. We view them as adding to, rather than detracting from, the factual basis in the plea agreement. The temptation to ignore these additional facts as irrelevant, too complex or merely as contrary to the narrative of Mr. Roglieri as the only wrongdoer[7] should be avoided. We view them as vital to a full

---

[7] Beyond the principals of Reign and Berone and Martin Karo, Kris' co-conspirator, Ms. Humphrey, for example, was evidently a grifter before she had ever heard of Kris Roglieri. PSR ¶¶ 68-73. Further, the apparent connection between Bo Zinno and Ms. Humphrey, which led to a $2

understanding and explication of the offense conduct, and as inextricably intertwined with key events in the fraud. More, they are amply supported by documents referenced herein, including Ms. Humphrey's records, and the lengthy correspondence between Mr. Roglieri, Ms. Humphrey and the principals of both Reign and Berone. Throughout 2022 and 2023, Mr. Roglieri was strung along by the two entities with the promise of a credit line and funding coming shortly. As loan obligations were coming due, Mr. Roglieri panicked, finding himself in an unfamiliar dilemma, and used other ICA deposits to meet those loan obligations and to pay himself. At the end of the day, however, Mr. Roglieri accepts responsibility. His actions ended up making things worse both for borrowers, and for himself and his family. His part in that process is undeniable, and he continues to reckon with it.

But it stands in marked contrast to his lengthy track record in commercial lending and loan brokering, which involved helping over 100,000 businesses and real estate investors. Additionally, while of limited relevance to this case, Prime Commercial Lending, Mr. Roglieri's primary business, was chosen by the Small Business Administration to facilitate the financing of PPP loans through the COVID pandemic, between 2020 and 2022. This involved approximately $600,000,000 in loans to borrowers nation-wide. As recent cases in this district and elsewhere make clear, if ever there was an opportunity for fraud, it was during the pandemic-era PPP loan program. And yet despite administering hundreds of millions of dollars in such loans, Mr. Roglieri engaged in no wrongdoing until PCV started to implode.

---

million transfer in late-December 2023, also caught Mr. Roglieri off guard, and seems to have been engineered by her own deceptions of Mr. Roglieri.

### The 1800 Park Avenue Transaction

As far as the 1800 Park Avenue transaction, Mr. Roglieri was not a part of the primary negotiations[8]. Nor is there a record of communications in which he was explicitly made aware of the material changes that the borrowers requested and that were inserted into the contract, as he was not included on relevant email or text message chains [Attached Exhibit X]:

**From:** Scott Williams <swilliams@alinecapital.com>

**Date:** December 21, 2023 at 4:22:42 PM EST
**To:** Kimmy Humphrey <kimmy@primecommerciallending.com>,
scott@primecommerciallending.com
**Cc:** Sammy Lortz <slortz@alinecapital.com>, JD Lehman <jdlehman@alinecapital.com>
**Subject: Wise Egg $103mm Loan - redline DLOC and Deposit Agreement**

Kimberly and Scott,

Please find attached redline and clean version of both the DLOC and deposit agreement. I have reviewed and believe most of the redlines should be pretty straightforward and acceptable. I wanted to point out two things:

1. On the DLOC they changed the interest rate to 7.5% because that is what came across on the deposit agreement. I think Kimberly had used an old deposit agreement that had 7.5%. Our loan commitment has 8%. Not trying to pull a fast one on you all here so please look at that in both documents and confirm what it needs to be.

2. They made changes to the draw schedule. The total still adds up and I believe the changes to be immaterial (first draw actually went down), but wanted to bring to your attention. This was done after their project manager and accounting team on the construction side went through it one last time.

---

[8] We recognize that even if Mr. Roglieri were entirely innocent or blameless with respect to this transaction, he would not be innocent or blameless overall, or with respect to other borrowers and transactions. Nevertheless, this transaction and the series of communications that led up to it, took on outsize importance in the case, as it was the subject of the complaint, the initial indictment, and the substantive wire fraud counts in the superseding indictment. Thus, it is well worth some discussion herein, and illustrates the larger point that the extent of Mr. Roglieri's culpability is more circumscribed than the maximalist, caricatured version of his conduct or him as simply a greedy villain. At the same time, nor should it be taken as any backtracking on his acceptance of responsibility overall.

There are some additions to the deposit agreement.  Albeit, immaterial in my opinion just some added attorney language, but I imagine we need to focus on agreeing to that so we can sign it tomorrow.  Borrower is ready to wire in the $5mm tomorrow as soon as we can finalize.

If we need to put your counsel in touch with Borrower's counsel, I have copied his signature block below:

**Subject:**  Re: Wise Egg $103mm Loan - redline DLOC and Deposit Agreement
**From:**  Scott D <scott@primecommerciallending.com>
**Sent:**  Fri, 22 Dec 2023 12:12:02 -0500
**Cc:**  Kimmy Humphrey <kimmy@primecommerciallending.com>, Chris Snyder <csnyder@primecommerciallending.com>, Erik Martin <erik@primecommerciallending.com>, Sammy Lortz <slortz@alinecapital.com>, JD Lehman <jdlehman@alinecapital.com>
**To:**  Scott Williams <swilliams@alinecapital.com>

Hey Scott, we are good with the red lines for the email. I sent you earlier today from Kimmy. Please have the DocuSign executed. Thank you.

Sent from my iPhone

On Dec 22, 2023, at 11:34 AM, Scott Williams <swilliams@alinecapital.com> wrote:

Thanks!  Wire has been sent and deposit agreement has been signed.  Jeff also received the loan docs in docusign.  Does he need to sign those as well, or do you all still need to review the redlines?

Thanks,

Scott Williams Managing Partner
Aline Capital, LLC
204 Westfield Street, Suite 100
Greenville, SC 29601
P: 864.729.3990
C: 864.423.5396
F: 864.491.5373
swilliams@alin
ecapital.com
www.alinecapit
al.com

All real estate brokerage activities of Aline Capital are conducted under ACIRE, LLC.

**From:** Kimmy Humphrey <kimmy@primecommerciallending.com>
**Sent:** Friday, December 22, 2023 7:46 AM
**To:** Scott Williams <swilliams@alinecapital.com>; Chris Snyder <csnyder@primecommerciallending.com>

**Cc:** scott@primecommerciallending.com; Erik Martin
                <erik@primecommerciallending.com>; Sammy Lortz <slortz@alinecapital.com>;
                JD Lehman <jdlehman@alinecapital.com>
**Subject:** Re: Wise Egg $103mm Loan - redline DLOC and Deposit

        Agreement Scott,

        Will you send us confirmation when the wire is sent- I'll have it confirmed on our end.

        Congrats!

        On Fri, Dec 22, 2023 at 7:26 AM Scott Williams <u>\<swilliams@alinecapital.com\></u> wrote:

That contract contains restrictions that do not appear in the other contracts that Prime concluded

with other borrowers.  Compare the 1800 Park Avenue terms:

> a. The Lender hereby acknowledges receipt of such funds and agrees to hold the Deposit Amount in a separate and distinct account for Borrower, subject to the terms and conditions of this Agreement. The Deposit Amount shall be held as a trust fund and shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any party hereto.

with earlier examples without that type of express limitation:

> Lender.  An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA").  A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the Loan.

USAO 289849.

        Further, records provided from DocuSign in discovery show that the document, before Mr.

Roglieri signed it in December 2023, was reviewed for about 9 seconds:

Kris Roglieri
kris@primecommerciallending.com
Security Level: Email, Account Authentication
(None)

DocuSigned by:

45B68CA27A2F457...

Signature Adoption: Drawn on Device
Using IP Address: 104.28.55.232
Signed using mobile

Sent: 12/22/2023 5:32:50 AM
Viewed: 12/22/2023 6:12:03 AM
Signed: 12/22/2023 6:12:12 AM

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PM | PM | | | Delivered | | | | |
| 12/22/2023 2:11:58 PM | 12/22/2023 2:11:58 PM | Web | Kris Roglieri | Opened | Kris Roglieri opened the envelope [documents:(REDACTED)] | Sent | 104.28.55.232 | English (US) |
| 12/22/2023 2:12:03 PM | 12/22/2023 2:12:03 PM | Web | Kris Roglieri | Viewed | Kris Roglieri viewed the envelope [documents:(REDACTED)] | Sent | 104.28.55.232 | en |
| 12/22/2023 2:12:12 PM | 12/22/2023 2:12:12 PM | Web | Kris Roglieri | Signed | Kris Roglieri signed the envelope on mobile | Sent | 104.28.55.232 | en |
| | | | | Printed | | | | |

It was opened, viewed, and then signed all in a period of 15 seconds, and on a cell phone, not a computer. This was consistent generally with the review period Mr. Roglieri brought to bear for other contracts. Thus, even if he was aware of the changes and new restrictions in the 1800 Park Avenue agreement, they would have seemed a small detail rather than a premeditated and deliberate deception on his part.

The more natural inference is that Mr. Roglieri overlooked the significance of such a term, just as he overlooked the significance of representations that PCV could provide sufficient loan funding in pursuit of the end game and the provision of millions of dollars in loan funding. That dereliction of duty becomes criminal with the use of the wires; that is the essence of mail or wire fraud. But again, it is qualitatively different from other cases (or the fact of being defrauded here by Reign and Berone) that feature more rank and premeditated deception where nothing legitimate was ever intended.

### Mr. Roglieri's Luxury Expenditures

Finally with respect to the offense conduct, it behooves us to spend a few moments on Mr. Roglieri's luxury expenses purchased with proceeds of the fraud. There is no doubt that he spent lavishly, unwisely, and excessively on items and services that went well beyond the bare necessities. But several points mitigate these expenditures, or contextualize them as less damning that might appear at first blush.

For one, his expenditures and lavish lifestyle were largely the continuation of what he had begun before the fraud began. Even before Prime Capital Ventures was formed, Mr. Roglieri lived

25

in a large house, had an expensive watch collection, travelled to exotic locales on private aircraft, and collected rare and extremely valuable cars.  He was already wealthy man who enjoyed the fruits of his success.  If the influx of money after forming Prime Capital Ventures accelerated these tendencies, it did not kickstart them.  Why does this matter in sentencing?  Only because he was already wealthy, and to the extent motivations matter at sentencing [*see Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993) (citing authorities)], he did not suddenly decide to carry out a fraud to get rich quick. He did not resort to criminal conduct to simply begin buying luxury cars that he could not otherwise afford.  Or to avoid the rigors of work otherwise.  Or for glorification or vanity or self-aggrandizement.  In a difficult period, he panicked, made a series of bad decisions, and his better judgment deserted him.

Second, it is not in questions that once it became apparent that large amounts of money from Berone were not forthcoming, Mr. Roglieri should have shut the whole thing down.  This includes both the solicitation of additional ICA payments and his own luxury expenses.  But if Mr. Roglieri's pace of acquisition accelerated in late-2022 into the earlier part of 2023, it also slowed significantly through the course of 2023 and into the latter stages of the year.  As set forth, for example, in the Government's *In Rem* complaint in 24-cv-1345-MAD, most of the listed automobiles, the Ferrari engine table, the Rolex and Richard Mille watches and the real estate parcel in Virginia (the forfeitable assets listed in the Indictment and plea agreement) were purchased no later than February 2023 (or had been obtained earlier and maintained with proceeds of the fraud). Kris got carried away quickly, but then reined himself in as the situation was deteriorating[9].  And of

---

[9] The December 2023 expenditures – including private air travel to the Caribbean and a Rolex that cost approximately $84,000 – would seem to suggest otherwise, but they are more aberrational in an overall downward trend since the earlier part of 2023, and in any event, constitute together a small portion (3.7% approximately) of the larger $5,000,000 ICA payment that Prime received in December 2023 on the 1800 Park Avenue transaction.

course, all those cars and the other trappings of a lavish lifestyle are long gone, forfeited, seized or otherwise.  He has already lost and been divested of the ill-gotten gains, and still will have a substantial financial judgment against him in the way of forfeiture and restitution.  Leaving custody, Mr. Roglieri will not go back to his mansion or his toys.  Whenever Kris is released from prison, it will be as a pauper; he will not be returning to the life he once knew, but will have to start over nearing or after 50.  It is hardly an enviable position, irrespective of whatever term of imprisonment the Court deems most appropriate.  We are not suggesting that acquiring and then losing all those items is a sufficient substitute for imprisonment, but that the overall context in which such activity occurred does not inherently require an even more substantial prison term.

Third, in a perverse way, it was money that he viewed as having earned.  Or, *would have earned* in the way of commission had the deal in question gone through, which was the objective and mutually beneficial to both parties.  That is, had Prime Capital Ventures been able to provide loan funding to the borrower as both parties intended, Kris would have been entitled to generous compensation.  The lender, meaning Prime Capital Ventures, was typically entitled to a 5% fee for each individual line of credit it ended up extending.  As that amount cumulatively stretched into the hundreds of millions, if not billions, of dollars, Prime, meaning Mr. Roglieri as the principal or sole member, would have been entitled to a correspondingly large amount in commission.  In effect, he paid himself well before the deal went through.  This was premature at best, and certainly unwise.  Plainly he erred in spending that money before he was entitled to it, and having acquired it in a fraudulent manner.   But we resist the characterization that Mr. Roglieri constructed and committed an elaborate fraud in order to steal others' money that he would not otherwise have been entitled to.  The result that he wanted – consummation of a lending agreement with the borrower – was mutually beneficial and would have earned him substantial legitimate compensation.

27

Whatever the optics, spending large amounts of money on rare automobiles or fancy watches does not make the underlying conduct any more fraudulent or deceptive.   It is a part of the record that does not put him in a positive light, but it is only part of the case.  And as it concerns the offense conduct, the focus should be on how he acquired the funds rather than how he spent them.

### Kris' History and Characteristics Further Mitigate the Offense Conduct

Kris was born on Christmas Day (in fact he was named for Kris Kringle) in 1979.  He is now 46 years old.  He takes great pride in being a self-made man, having built himself into a success story well before the fraud at Prime Capital Ventures began.  Yet he is not a particularly sophisticated person.  He was born and grew up in Kingston, New York, in circumstances far different from those he would know later in life.  His father was a Korean War veteran, and later, a union delegate, while his mother worked in retail.  Kris has two older brothers, including a nephrologist in the Capital region.  Their parents separated when Kris was around 5 or 6, and for a time, Kris' family was forced to live in a shelter.

Kris' background was a humble and modest one.  He comes from a hardscrabble place and was raised in scrappy fashion.  This imbues his personality, his outlooks, his longings, and played a role in the offense conduct as well.  We see it, for example, in all of his charitable and philanthropic efforts to help the less fortunate by spreading the fruits of his own success.  He has known hard times, so Kris sees his own story in those who are struggling.

But we also see it in the relentless acquisition of more luxury cars, ever more exotic or rare ones, fancier jewelry, all the trappings of wealth, at least as Kris perceived it.  To some, that might seem inexcusable or unexplainable.  But in part, psychological factors drove this – saying to the world, in effect: *Look at me.  I've made it.  I'm a success, even though I started as just a scrappy kid from Kingston who dropped out of college.  Look what I've made of myself.*  Flaunting his wealth is to convince himself he belonged in a rarefied, exclusive world, despite his origins.  And in this way, it projects

understandable insecurity rather than mere gaudiness or excess.  It invites sympathy, not simply

scorn.  This is often the case with *new money*.  *Old money* -true generational wealth – tends to be more

discreet.  The *parvenus* need to show it off.  Yet nothing was handed to him in life.

After graduating high school, Kris attended several semesters of community college, and

then dropped out of SUNY-Albany before he could earn his degree.  He began working instead.  He

had always worked through school, including as a transport provider for disabled patients.  At a

young age, Kris became an entrepreneur, having founded an e-commerce site selling perfumes

around the dot.com boom in the late 90s or early 2000s.  He ended up selling that business, and

founded Prime Commercial Lending approximately 20 years ago.  This began a successful career as a

loan broker, and Prime Commercial Lending emerged as one of the most notable lending

institutions in the region.  What started as a loan brokerage, eventually turned into becoming the

direct lender to commercial businesses.

Kris also founded industry groups and training programs, most notably the National Alliance

of Commercial Loan Brokers, and Commercial Capital Training Group, which trained aspiring loan

brokers.  Kris' personal life also fell into place as his business blossomed.  He married Tina in about

2008, and they had two children, a daughter now aged 15, and a boy, now 13.  He moved into an

expensive, large house in Queensbury around 2014.  Several years later, his marriage started to

crumble, and the two separated around 2018.  He remained a devoted, active father, however, and

ended up with the children more often than not, and was a constant in their lives, schooling, and

activities.  Mr. Roglieri also remained the sole supporter of his ex-wife, and the children, until his

arrest in May 2024.

Not terribly long before his arrest, he entered into a committed relationship with Linda

Oliver, who has remained by his side, and who plans to live with him in Poughkeepsie after eventual

release from prison.  Linda has also become an important part of his family and the lives of his

children. According to one supporter, he is "an excellent father and a devoted partner to [Ms. Oliver]. His children absolutely adore him, and it is clear that he is a steady, loving presence in their lives. He has always treated Linda with respect, care and attentiveness." Youngren letter. Another friend rights that Kris has "always put [his children] first." Schepici Letter. His neighbor in Queensbury writes that Kris appeared to be a very attentive, loving father and a hardworking man who made his children a priority." Mathis Letter. "His children clearly loved him, and he showed up for them in ways that matter. . . and I am sure that his absence is devastating for the kids." *Id.* Of course their own letters confirm this as well. Likewise, Kris' mother is not well, and as she deteriorates, their separation wears on Mr. Roglieri. Linda writes that watching her health decline from a distance has been very difficult for him. L. Oliver Letter.

Kris' dedication extends not only to his family, but to his community, and to strangers. "The Kris Roglieri I know is a generous, caring individual who has been a devoted father to his children and an active participant in the community we share." Yager Letter. Multiple people have written as to his generosity and their charitable work with him. "He is someone who is always willing to lend a hand and support those in need." Youngren Letter. We hear that often enough, but some examples are warranted.

Councilman Derek Johnson notes that Kris "generously funded free turkey giveaway programs in the South End, initiatives that enabled us to assist over 2000 families in our community. These efforts made a meaningful difference to families who needed support, particularly during the holiday season." Johnson Letter. He notes that Kris "stood out for his genuine desire to help and his commitment to exceeding expectations each time we collaborated." *Id.*. Kris' friend William Yager writes that "[when the event began, we distributed approximately 300 turkeys in 2018. Over the course of five years, the program grew to providing more than 2,000 turkeys, along with all the traditional holiday sides, to families in need. While I oversaw the operational and logistical aspects of

30

the event, Mr. Roglieri personally funded the program and organized the volunteers who made it possible. The final year's cost was approximately $50,000, and we estimate that the program helped feed more than 2,000 families, many of them households of five or more." Yager Letter.

His generosity includes his time, not just his money: "For several years he organized and worked at a free Thanksgiving dinner for people in the community, spending the whole day there with his children helping, not just writing a check." Schepici Letter. Linda writes as to his Turkey giveaway that he "brought his children with him so they could learn the importance of helping others and understanding that there are families who struggle. It was important to him that his children grow up knowing that giving back is part of being a good person." L. Oliver Letter.

We see this elsewhere too, as his friend Larry Schepici notes that "during COVID, when nurses and doctors were still working in the hospital every day, he paid to have us cook and serve food for the staff at Samaritan Hospital in Troy so they felt supported and appreciated." Schepici Letter. "He also helped employees in quiet ways, like paying for food and support after the death of one worker's parent, without asking for public thanks." *Id.*

Another friend notes:

> One of his biggest passions was charities. He would set up yearly fundraisers for the Children's Hospital that would raise thousands of dollars. I would drive clients to and from these events which were held at his house in Queensbury. Once there he would always invite me to stay for as long as I could and always offer me food and drinks. This is exactly the type of person he is. He never just saw me as his driver. He always treated me like a person and a friend. That always stuck with me because not everyone treats the people working for them that way. It showed me the kind of person he really is. I have also seen him treat everyone around him with the same level of respect whether it was employees, clients, or people he had just met.

Green Letter. Even an ex-girlfriend [normally not someone we hear from in character letters] offers support from when Kris was living a far more modest lifestyle, working "at the ARC taking care of mentally challenged individuals in a home. He loved his job. He would always

31

tell me about them.  It brought him joy to help them.  And those people were lucky to have Kris as well.  Kris would do anything for anyone.  He would go out of his way to help put grocery bags in elderly people's trunks for them.  He would be the 1ˢᵗ one to offer his seat if anyone needed it.  He's just a kind person."  Pugsley Letter.  We are also re-submitting several letters written on Kris' behalf and submitted to the Court previously for the purpose of requesting his release on conditions.   ECF Document No. 17, at pages 7-9, 17.  While written ostensibly for a different purpose, these letters as well offer a window into Kris' history and characteristics, a window is very much consistent with the sentencing letters.

Incarceration has obviously taken a toll and was particularly difficult early on, as he was suddenly separated from his children, and had never been in custody before.  It could have gone south, and he could have retreated into a cocoon of self-pity and resentment.  Instead, it has been mostly the opposite.  He has become a trustee, has become a valued member of the inmate community, and is well liked by both staff and inmates.  He has used the time wisely and productively, beyond the efforts at discovery review and case consultation, which have been extensive.  That could have been his sole focus, yet he has accomplished much more.  The Inmate Services Coordinator has encountered "only a handful of inmates who [she] strongly believe[s] are worthy of this letter based on their character, actions, and my observations[.]"  Grady Letter.  Kris entered the worker's unit and assists kitchen staff in food and meal prep, and also assists in many other duties when called upon.  Grady letter.  He has helped other inmates navigate their own legal challenges.  He was chosen to speak with young people in need of re-direction.  "Staff recognized his unique ability to connect with these kids, leaving them with a very positive experience."  *Id.*

This appears to track what numerous supporters have described as a "capacity for introspection and growth," [Youngren Letter] as seen both in his own letter and others' – a trait which is not universally shared among fraud defendants, it should be said.  Some are committed

32

narcissists utterly without that capacity. But not Kris. He has talked regularly about helping others avoid poor choices by using the power of his own example and his misdeeds. Schepici Letter. But the Court should take it from Kris' letter as to his level of remorse and contrition. The unintended benefit of being incarcerated is that it provides time for reflection and contemplation that sometimes is lacking amidst our day-to-day lives. Kris writes that "[a]lthough this experience is a very hard lesson learned, I choose to view this a powerful learning experience that will shape my life in a very different positive direction from this point on." Roglieri Letter. His regret and his impact on victim losses speaks for itself. *See id.* While it is important to Mr. Roglieri that the Court learn the nature of how he was defrauded and the role that played in the offense, his letter wisely goes beyond that, and knowledge of the hurt and loss he has caused is real and devastating to him. *See id.*

To reiterate, Kris' philanthropic and community service efforts included yearly fundraisers for the local Children's hospital, a regular Thanksgiving Turkey dinner giveaway for the Albany Community, buying meals for doctors and nurses at Samaritan Hospital during COVID on multiple occasions, sponsoring local youth sports teams, donations to the Marine Corps so they could hold an annual Christmas ball, providing thousands of dollars in gift cards through the schools in Glens Falls during the holidays for disadvantaged children, and bringing children to see classic cars through the Ronald McDonald house. His would-be father-in-law writes that when Kris came to Houston to meet him and his family, he was living in a shabby motel and was in a bad way, but that:

> Kris found me. He brough me food and supplies. More importantly, he sat with me and talked with me. He told me I did not have to live that way. He worked with my children to help me find a small apartment closer to my family where I could be safe and within my veteran's pay budget. That meant more to me than I can explain. That is not something a man does for attention. That is something a man does because he cares.

E Oliver Letter. The enduring image from this case should be a guy who "showed up for an elderly veteran in Houston when he did not have to" rather than his excessive car collection or his 6th Rolex.

33

There are good impulses in Kris Roglieri that both pre-date and post-date the offense conduct, and that even were present contemporaneous with the fraud. He looks to build on them in the future.  Plainly, he did these things because they were the right things to do, and he was fortunate enough to be in a position to help – not with the expectation that he would somehow need to rely on them in pleading for mercy from a criminal court at some point down the road.  Still, we would be remiss not to highlight Judge Rakoff's wise words from the dawn of the post-*Booker* era when it came to sentencing a defendant with a high fraud loss figure:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).  There is plainly much more to Kris Roglieri than the fraud he committed at Prime Capital Ventures.  We ask the Court at sentencing to ensure that he is defined as much his more admirable qualities as successful businessman, adoring, devoted father, committed community member and generous philanthropist, as by the offense conduct herein.

### The Requested Sentence is Consistent with Comparable Cases

There are enough fraud or economic crime sentences such that reference to others becomes something of a *Rorschach* test, ranging from probation to something measured in centuries.  Of course, it can be difficult to find comparators even among those with comparable loss amounts. Nevertheless, the following cases illustrate that a 4-6 year term here would leave the Court comfortably within the mainstream of fraud sentences meted out in recent years within the Second Circuit and elsewhere.  Certainly a high loss amount does not invariably lead to a high or draconian sentence.

34

*United States v. Charlie Javice*, Case No. 23-cr-251 (S.D.N.Y. defendant convicted after trial and a $175 million fraud, sentenced to 85 months in 2025 in massive student loan scam involving generation of fictitious data and entities);

*United States v. Andrew Hackett*, (S.D. Cal. Defendant, Canadian stock promoter, sentenced to 46 months after trial and multi-million dollar intended loss in connection with securities fraud scheme as to initial public offering and manipulative trading), opinion at 123 F.4th 1005 (9th Cir. 2024);

*United States v. Barry Breeman*, 25-cr-211 (S.D.N.Y. defendant real estate developer defrauded dozens of investors in sham real estate projects  and generation of fictitious data, and received over $13 million from victims, sentenced to 36 months)

*United States v. David Gentile*, Case No. 21-cr-54 (E.D.N.Y. registered investment adviser defendant sentenced in 2025 to 84 months after trial, having defrauding thousands of investors of $1.6 billion following creation of GPB Capital and promising false investment returns in private equity fund over multi-year fraud and illegally routing new investor money back to older investors in guise of investment returns; sentence commuted by President Trump after spending just 12 days in prison);

*United States v. Manuel Chang*, Case No. 18-cr-681(E.D.N.Y. defendant, former Minister of Finance for Mozambique sentenced in 2025 to 102 months following trial in wire fraud conspiracy and $2 billion international fraud and money launderings scheme and acceptance of over $7 million in bribes);

United States v. *Ilya Lichtenstein*, Case No. 23-cr-239 (D. D.C defendant sentenced to 60 months in 2024 after hacking cryptocurrency exchange and stealing 120,000 bitcoin worth upward of $4 billion, following guilty plea to money laundering conspiracy);

*United States v. Lawrence Billimek*, Case No. 22-cr-675 (S.D.N.Y. defendant, TIAA-CREF senior equity trader, sentenced in 2024 to 70 months in insider trading scheme that lasted over 6 years involving over $12 million realized over thousands of trades in "front running" fraud, through burner phones and accrual of 8 real estate properties).

The list could go on, but again, the point is not that Mr. Roglieri is similarly-situated to all of these defendants; some might have more culpability and some less.  Rather, it is that sentencing Mr. Roglieri in line with the defense request would be consistent with similar sentences imposed on fraud defendants in recent years, and certainly would not cause any unwarranted disparities.  And of

35

course, this is not to mention the number of fraud defendants (including the aforementioned David Gentile) that the current administration has seen fit to pardon or offer clemency[10].

**The Guidelines Over-Emphasize Loss and Produce a Range Far Greater than Necessary**

Judges at sentencing have long taken issue with the fraud Guidelines, and the draconian sentences they would otherwise recommend in light of high loss amounts.  This is no longer a controversial position, and becomes even less so the farther removed from *Booker* and the era of mandatory Guidelines.  The short of it is that fraud loss - beyond the simple conceit that a defendant responsible for causing a greater loss amount might be more culpable than one who causes a more modest amount – is a particularly poor proxy for the wrongfulness of a defendant's actions.  This is especially true in light of the complexity of human conduct and the myriad factors that go into sentencing under Section 3553(a).

The Guidelines' place in the sentencing firmament is no longer mandatory, nor even close to it, as it might have appeared in the years immediately following *Booker*.  Almost two decades ago, the Second Circuit made it "emphatically clear" that the Guidelines are *truly* advisory.  *See United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (emphasis added).  They cannot be presumed reasonable, are merely one factor among many, cannot be ascribed more weight than the other statutory factors, and "constitute [] only a touchstone in the district court's sentencing considerations."  *See United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009) (citing cases); *see also Nelson v. United States*, 129 S. Ct. 890, 892 (2009); *Gall v. United States*, 552 U.S. 38, 59 (2007); *Rita v. United States*, 551 U.S. 338

---

[10] *See Trump's Pardons Forgive Financial Crimes that Came with Hundreds of Millions in Punishments*, Owen Auston-Babcock & Megan Shannon (January 20, 2026), available at https://www.nbcnews.com/politics/trump-administration/trumps-pardons-forgive-financial-crimes-came-hundreds-millions-punishm-rcna248277; *Pardon Industry Offers Rich Offenders a Path to Trump*, Kenneth P. Vogel (Mar. 6, 2026) available at https://www.nytimes.com/2026/03/06/us/politics/schwartz-trump-pardon-industry.html.  Mr. Roglieri, whose assets and wealth has been thoroughly divested, cannot count on being so fortunate.

(2007); *United States v. Broxmeyer*, 699 F.3d 265, 290 (2d Cir. 2012). We are not supposed to start out with "any thumb on the [Guideline] scales." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). More, the Guidelines may be excessive "even in a mine run case," and extraordinary circumstances are *not* required to justify a downward variance. *Kimbrough*, 552 U.S. at 109-10; *United States v. Stewart*, 590 F.3d 93, 135 (2d Cir. 2009). That said, the extraordinary circumstances as to how Mr. Roglieri was bamboozled out of $20 million take this case far from the mine-run, or well "outside the "heartland" of fraud sentences under Chapter 2B1.1. *Rita*, 551 U.S. at 344. And while there are myriad reasons to be wary of Guideline sentencing in general, particular caution is warranted when it comes to economic loss.

The Guidelines' claim to respect or deference was supposed to flow from the Sentencing Commission's inherent expertise, and the exercise of its characteristic institutional role, which encompasses systematic review of empirical data and national experience. *See Gall*, 552 U.S. at 46 *Rita*, 551 U.S. at 348-50. Guidelines that do *not* take into account empirical data and national experience "do not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role." *Cavera,* 550 F.3d at 188 (quoting cases). The court's latitude to disagree with the Guidelines is thus greatest for those that lack a basis in empirical data and national experience. *See, e.g., Kimbrough,* 552 U.S. at 109 (crack-cocaine ratios); *United States v. Dorvee,* 604 F.3d 84 (2d Cir. 2010) (child pornography). Without such a basis, the rationale for deference to such Guidelines evaporates.

The labyrinthine Guideline covering economic loss (Chapter 2B1.1) is another such example, and this was true right from the start. "For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar crimes." *United States v. Herink*, 2012 U.S. Dist. LEXIS 105449, at *12 (D. Neb. July 30, 2012) (citing authority). Because the Commission, in looking at empirical data, had determined that many fraud

sentences were disproportionately low, it adopted a paradigm of short but definite terms of imprisonment (as opposed to the frequent pre-Guidelines practice of sentencing first time, non-violent white-collar offenders to probation), which was seen as an adequate deterrent. *See Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (U.S.S.C. November 2004); Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest,* 17 Hofstra L. Rev. 1, 20, 22 (1988);*see also* U.S.S.G. Ch. 1 Pt. A, Introduction (1987).  It also made the pecuniary loss from the offense the primary determinant of length of sentence.

Things would look far different if it ended at that point, which by itself was a significant departure from historical practice and empirical experience.  To wit, under the original Sentencing Guidelines (Ch. 2F1.1) as they took effect in 1987, Mr. Roglieri would have faced a range of either 27-33 months (adjusted offense level of 18, with the two-level leadership enhancement) or 21-27 months (adjusted offense level of 16, without the aggravating role enhancement).  Even using the higher figure, the Government's range in the plea agreement, 97-121 months, represents a **four-fold** increase[11].

However, since the original guidelines were promulgated in 1987, fraud sentences have grown increasingly punitive and *disproportionate* through increases in the amount of specific offense characteristics (6 to 18, many of which are overlapping or all but inherent in the offense[12]), and

---

[11] We do not suggest that a sentence around 27 months would be appropriate or sufficient. But the disparity is marked enough such that, and unaccompanied by empirical or penological justification, a middle ground of the sort sought by Mr. Roglieri becomes more warranted.

[12] Here, the amount of fraud loss is substantial, and by itself accounts for a 22-level increase in the offense level.  Beyond that, however, two additional levels are added to account for the number of victims, as set forth in Paragraph 92.  As a matter of Guideline calculation, this is correct, and we have stipulated as much.  But as a matter of penology, it is already accounted for in the very nature of the crime.  The gravamen of the offense is that Mr. Roglieri used borrower money in ICA payments to fund other loan agreements with other borrowers.  Thus, the number of borrowers is

38

number of points for the amount of the loss.  The Commission has all but abandoned its original guidepost for white-collar sentencing, that short but definite periods of imprisonment achieve an adequate deterrent effect, provide just punishment, and are proportional to sentences for other offenses.  Worse yet, these increases have been unaccompanied by empirical and experiential support that might demonstrate why longer sentences were needed, or why shorter terms were insufficient to achieve the goals of sentencing.  *See* Alan Ellis, John R. Steer & Mark H. Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34  (2011) ("[A]s legislatively directed enhancements have proliferated, particularly within the fraud guideline, the objective of proportionality among offenses has gone by the wayside."); *Adelson*, 441 F. Supp. 2d at 514 (S.D.N.Y. 2006) (comparing the lack of empirical support that the Guideline regime achieves the objectives served by sentencing, with "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective white-collar offenders").  Instead, the enhancements have been driven by reactionary politics, corporate scandal, and Congressional mandate. *See Herink,* 2012 U.S. Dist. LEXIS 105449, at *13-14 (detailing Guideline amendments that emanated from Congressional directives); *United States v. Zauner,* 688 F.3d 426,431 (8th Cir. 2012) (Bright, J., concurring) ("While Congress's direct involvement in the guidelines is not inherently problematic, it is suspect when it lacks significant policy discussion and analysis.").

The dubious genesis of the fraud guideline, grounded in how the prevailing political winds were blowing rather than in empirical and experiential reality, plagues it in two related ways.  First,

---

necessarily accounted for in the 22-level increase, which would never have risen to that level in the absence of a large number of borrower victims.  In other words, that the offense involved more than 10 victims is more of a defining characteristic than an aggravating one, a feature rather than a bug.  This is what Judge Newman, *infra*, criticized as "incremental immorality" or the idea that "for every discrete aspect of criminal conduct, there must be a discrete measure of extra punishment." In the abstract, defrauding a greater number of victims might call for a greater sentence, but in the context of this case, it is already baked in, and amply reflected in the loss amount alone.

the numbers themselves are wholly arbitrary. *See United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (finding that the numbers assigned by the Sentencing Commission to various factors are "plucked from thin air [and] appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology"); *Adelson*, 441 F. Supp. 2d at 509 (criticizing the emphasis on measurable quantities like fraud loss "without, however, explaining why it is appropriate to accord such huge weight to such factors"); *Testimony of Judge Jon Newman Before the United States Sentencing Commission*, July 9, 2009, at 7-8 (arguing that the incremental increase in punishment by loss amount as "creates an illusion of precision . . . [and] makes no penological sense").

Second, there is frequently little correlation between the amount of the loss and the defendants' relative levels of culpability. *See United States v. Emmenegger*, 329 F. Supp. 2d at 427-28 (S.D.N.Y. 2004) (noting that loss amount is frequently a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence); *Herink*, 2012 U.S. Dist. LEXIS 105449, at *19 (loss "is not always a reliable proxy for the culpability of an individual defendant. When losses amount to millions of dollars, the Guidelines' graduated system of increasing culpability aligned with increasing loss is especially skewed."). Loss amount, though not irrelevant, does not take into account the 3553(a) factors and therefore ends up often overstating the seriousness of the offense. *See United States v. Prosperi*, 686 F.3d 32, 43-44 (1st Cir. 2012); *United States v. Spencer*, 700 F.3d 317, 325 (8th Cir. 2012) (Bright, J., dissenting) ("The fraud guidelines . . . no longer provide a reasonable starting point for sentencing [because] [a]djustments based on the amount of the loss lead to astronomical sentences that have little connection to criminality.").

Like the drug guideline's inordinate emphasis on weight, judicial dissatisfaction with the fraud guidelines stems largely from the distortive effects created by linking the length of sentence to the amount of the loss without regard to culpability. *See Adelson*, 441 F. Supp. 2d at 509 ("What

drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of [loss]."); *Emmenegger*, 329 F. Supp. 2d at 427 (criticizing the guidelines for placing "excessive weight on [the fraud loss] factor, attempting no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes to assign precise weights to the theft of different dollar amounts").

The Second Circuit has been skeptical of some Guidelines enhancements that "apply without modulation to a wide range of conduct." *Cavera*, 550 F.3d at 192. *Cavera* highlighted 2B1.1 as an example which drastically var[ies] as to the recommended sentence based simply on the amount of money involved. *Id.* Grouping together defendants with a broad spectrum of culpability may call for the district court to impose non-Guideline sentences based on the 3553(a) factors. *Id.*; *see also Stewart*, 590 F.3d at 136, 144 (the "district court may find that . . . there is a wide variety of culpability amongst defendants [under the same guideline] and, as a result, impose different sentences based on the factors identified in 3553(a).") (citing *Cavera*); Ellis *et al*, *supra* (describing the fraud guideline as a "series of ad hoc amendments covering a vast array of distinctly dissimilar conduct").

### **What Courts Have Done**

Accordingly, under *Kimbrough*, district judges, with far greater familiarity with the individual defendants and the circumstances before them, have more discretion to disagree with the draconian sentences that the fraud Guidelines sometimes conjure up. *See Herink*, 2012 U.S. Dist. LEXIS 105449, at *19 ("Because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines."). And it is clear that the fraud guidelines have over time lost the respect of a good part of the judiciary.

Judges, more insulated from political pressures, have thus taken up the charge of crafting fair sentences for fraud offenders by varying (in some cases to a great extent) from the guidelines range. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines and the fundamental requirement of Section 3553(a) that judges impose sentences sufficient, but not greater than necessary to comply with its objectives." Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 169 (Feb. 2008). And it is often Judges in the Second Circuit (and some elsewhere) who have led the charge against a draconian Guideline range, sometimes offering blistering criticism along with substantial variances.

Faced with the prospect of sentencing high fraud loss offenders to draconian Guideline sentences, a number of judges in the Second Circuit and elsewhere, have recognized that such high sentences do not fairly reflect the culpability of the defendant before them, and have accordingly imposed substantial downward variances under Section 3553(a), sometimes with blistering criticism. *See Adelson*, 441 F. Supp. 2d at 515 (dismissing guidelines recommendation where offense level was 55 and loss in excess of $50 million, as patently unreasonable, patently absurd, barbar[ous], wildly off base, and denouncing the "utter travesty of justice that sometimes results from the guidelines fetish with abstract arithmetic, as the harm that guidelines calculations can visit on human beings if not cabined by common sense"); *United States v. Parris*, 573 F. Supp. 2d 744, 750-54 (E.D.N.Y. 2008) (varying downward in pump and dump fraud case to 60 months from "draconian and unrealistic" guideline range of 30 years, which should not be a "black stain on common sense"); *United States v. Treacy*, 639 F.3d 32 (2d Cir. 2011) (24 month sentence for executive for Monster.com in securities fraud scheme, down from guidelines range of 24-37 years); *Gupta*, 904 F. Supp. 2d at 355 (granting variance to insider trader defendant from with guideline range of 97 to 121 months on basis of $15

42

million gain, to two years' imprisonment); *United States v. Ovid*, 2010 U.S. Dist. LEXIS 105390,  at *9 (E.D.N.Y. Oct. 1, 2010) (sentencing fraud defendant to five year term where guideline range was 210-262 months); *United States v. Watt*, 707 F. Supp. 2d 149, 151, 154 (D. Mass. 2010) (24 month sentence for defendant with offense level 43and $20 billion fraud loss, as the guidelines were "of no help" and "almost irrelevant").  Of course, these defendants brought different facts and considerations to the table, and may not all have been similarly situated to one another or to Mr. Roglieri.  But that is the point: "the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."  *Ovid*, 2010 U.S. Dist. LEXIS 105390, at *4.

Statistics and national experience make this point as well, albeit with less panache.  In 2024, the last year for which complete Sentencing Commission data has been made available, just 41 percent of the 5,000 defendants sentenced under the Chapter 2B1.1 Guideline received a within-Guideline sentence[13].  That number represented an increase from the 37% figure the year before[14].  And it is fairly static year to year, as in 2022 and 2021, only 40% of 2B1.1 defendants received a Guideline sentence[15].  Thus, it is not an exaggeration to say that a Guideline sentence in a fraud case is the exception, not the norm.  And that exception becomes even more rare in the Second Circuit, where in 2024, just 27% of fraud/theft/embezzlement defendants received a sentence within the Guideline range.  This is significant because by volume, this Circuit features twice the amount of

---

[13] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2024/Table32.pdf.

[14] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2023/Table32.pdf

[15] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2022/Table32.pdf; https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2021/Table32.pdf.

fraud cases relative to the national average[16].  Further, it also tends to feature more high-profile cases with larger loss amounts that otherwise might call for longer sentences.

The JSIN data proves the point as well, at least to a large extent.  As noted in the PSR at Paragraph 147, the average and median sentences under the same Guideline, offense level and criminal history category over the last five years were 75 and 78 months respectively.  Put differently, when called upon to sentence fraud defendants with a Guideline range of 97-121 months and virtually no criminal history, Judges instead choose lower sentences roughly in line with Mr. Roglieri's request.  Because such cases involve a much lower base offense level (6 or 7), it is likely that most of these cases (at an adjusted offense level of 30) likewise feature a high fraud loss or amount under Ch. 2B1.1.  Thus, the more aggravated parts of our case are already or inherently reflected in the sentencing data.

Finally, in the last five years for which data is available, for fraud and economic defendants sentenced under Ch. 2B1.1 in CHC I (about 16,000 of them nationwide), the average sentence is just 18 months, while the median is just 9 months[17].  This is just one metric, and it may be that many of the defendants in this pool nationwide are not entirely comparable to Mr. Roglieri and the circumstances of this offense, but the disparity with the Guideline recommendation in our case is stark.  Even for those where the sentence resulted in imprisonment, the average sentence was 26 months, while the median was only 18 months.

---

[16] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/2c24.pdf (Figure A, Table 10).

[17] U.S. Sentencing Comm'n Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited March 10, 2026).

**Conclusion**

It has been a long three years for Mr. Roglieri and his family, both since his arrest and incarceration in May 2024, and in the increasingly desperate, frenetic period leaving up to those difficult events. We do not suggest that his rehabilitation is complete or that there is no more work for him to do. But pleading guilty, accepting responsibility, committing to restitution to make victims whole, and looking within himself to see where he went wrong and why, is surely a good start. He intends to build on that foundation in prison. However, for all the reasons discussed, a term in excess of 72 months is greater than necessary to punish him, hold him accountable, achieve some measure of rehabilitation and protect the public. And as critical as we are of the Sentencing Guidelines, *supra,* such a term is in line with our view of the Guidelines, accounting for the more democratic nature of the conspiracy, as well as Mr. Roglieri's complete lack of criminal history until his mid-40s. A longer sentence would simply delay rather than hasten his opportunity to turn the page and begin to make things right – for himself, his family, and most important, the victims of his fraudulent conduct.

Respectfully submitted,

Dated: March 16, 2026

ERIC K. SCHILLINGER
Federal Public Defender

By:     __/s *Jeremy B. Sporn*_____
Jeremy B. Sporn, Bar Roll No. 703650
Assistant Federal Public Defender
54 State Street, Suite 310
Albany, New York 12207
518-436-1850
Jeremy_sporn@fd.org