# OFFICE OF THE FEDERAL PUBLIC DEFENDER
# FOR THE NORTHERN DISTRICT OF NEW YORK



**Albany Office**

54 State Street
Suite 310
Albany, NY 12207
(518) 436-1850
(518) 436-1780 Fax

Eric K. Schillinger - Federal Public Defender
Emma Reynolds - First Assistant

**Syracuse Office**

4 Clinton Square
3rd Floor
Syracuse, NY 13202
(315) 701-0080
(315) 701-0081 Fax

March 23, 2026

Hon. Mae A. D'Agostino
United States District Court
Northern District of New York
445 Broadway
Albany, New York 12207

> Re: **United States v. Kris Roglieri**
> Case No. 24-cr-392-MAD

Dear Judge D'Agostino:

I write to briefly respond to the Government's Sentencing Memorandum, filed on March 16, and to address several discrete points raised therein. ECF Document No. 99. We are in agreement on a number of things, including that Mr. Roglieri made a significant amount of money, that he (or his co-conspirators) misled or lied to borrowers, and that he used proceeds of the fraud to support and maintain a lifestyle involving luxury expenditures. None of those things are in real dispute, but there are different, competing inferences to be drawn from them. Those inferences do not necessarily lead to the conclusion that the Guidelines sentence the Government requests is warranted or necessary.

First, I would like to issue one correction from our own papers [ECF Document No. 100]. Therein, I referred to the defense view of the Sentencing Guidelines at 51-63 months. This was my mistake; at adjusted offense level 26 (accounting for our view of the aggravating role enhancement and zero-point offender adjustment) and CHC I, the range would actually be 63-78 months. I apologize for this oversight, but our requested sentence at 4-6 years is still roughly in line with this Guideline calculation.

The Government references [at pp. 5-6] corporate salaries as a comparator, attempting to put into context Prime's receipt of roughly $55 million in loss over a two-year period. Certainly that is a lot of money, and it is amply reflected in the sizeable enhancement for loss (which was agreed to), resulting in an additional 22 levels. However, closing deals that called for Prime to

extend lines of credit worth hundreds of millions of dollars entitled Prime and Mr. Roglieri to a 5% commission under those lending agreements. Cumulatively, this represented a great deal of money, even if the fraud's existence disentitled Mr. Roglieri to legitimately claim such compensation. Second, salary (even including bonuses) often ends up at only a small percentage of a corporate executive's compensation. Particularly at leading companies like McDonald's or Mercedes Benz, the availability of stock options is where they make most of their money. "Like most chief executives, the majority of Karp's [the CEO of Palantir Technologies] compensation takes the form of stock, stock options, and other investment vehicles." *Shareholder Influence on Executive Compensation*, Lardner, Schuette & Woo, REGULATORY REVIEW (Nov. 2025) available at https://www.theregreview.org/2025/11/15/seminar-shareholder-influence-on-executive-compensation/; *see also CEO & Executive Compensation Practices in the Russell 3000 & S&P 500*, Harvard Law School Forum on Corporate Governance, available at https://corpgov.law.harvard.edu/2025/12/31/ceo-and-executive-compensation-practices-in-the-russell-3000-and-sp-500-3/. Musk, Zuckerberg, Bezos and others did not amass hundreds of billions of dollars in salary alone; far from it. Third, salaries and bonuses for executives in the financial and banking sectors, and for hedge fund principals, tend to be exorbitant. We respectfully submit that is the more relevant comparator, and while $55 million over two years is still a lot of money, it does not stand out in *that* world as starkly as the Government suggests.

The Government disclaims [at pp. 6-7] a connection between the offense conduct and Mr. Roglieri's interactions with Reign and Berone, noting it was an "unrelated scam." His own contemporaneous communications, however, demonstrate a strong nexus:



From: +15188529933 _$!<Other>!$_ (owner)

Gentlemen I don't want to be a pain in anybody's ass however we are facing and dealing with a critical situation that could sink our reputation and company if we can't access to these credit access lines. I know you are all working to get this in motion but this opportunity is in jeopardy and is solely dependent on timing here. It would be much appreciated if we can get interactive to get back to you on a firm day when it's good to go.

Status: Sent

3/15/2023 6:29:41 PM(UTC+0)

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db : 0x11F1B68 (Table: message, Size: 117440512 bytes)

From: +16784785803 Fabien
To: +15188529933 _$!<Other>!$_ (owner)

Hi All, we've been dealing with the Interactive team all morning to get across the finish line

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +15188529933 _$!<Other>!$_ | | 3/15/2023 7:19:02 PM(UTC+0) | |

Status: Read

3/15/2023 7:18:45 PM(UTC+0)

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db : 0x11F8F29 (Table: message, handle, Size: 117440512 bytes)

Defense Exhibit P, at page 37 (ECF Document No. 100-16). The following day, Mr. Roglieri again makes the same point:

From: +15188529933 _$!<Other>!$_ (owner)

Good morning . I know both of you are working very hard to get this up and running as Kimmy have me an update yesterday so thank you. To clarify our dilemma and being transparent we have funding obligations that were due weeks ago as we thought the facility would be up by this week. So we are taking a lot heat this week as we have to delay and are in a very vulnerable place that we have never been before with our reputation sinking by the day.

So if we can get the platform up by Friday or latest Monday so we can wire, and have access to funds by Tuesday would be a life saver for us

Status: Sent

3/16/2023 2:41:26 PM(UTC+0)

Source Info:
fs-partial-afu.zip/private/var/mobile/Library/SMS/sms.db 0x1211E6B (Table: message, Size: 117440512 bytes)

*Id.* at 39. The "funding obligations that were due" were scheduled draws under the lending agreements PCV concluded with various borrowers. Text messages, extending into January 2024, establish that Mr. Roglieri was still being promised access to hundreds of millions of dollars in investment proceeds that he could lend out to borrowers to meet his commitments.

As we have argued consistently, this does not constitute a defense or excuse the offense conduct, but it places it into proper context. In addition to the banking and account records that we attached as Exhibit K, the attached Exhibit K-A from Berone's bank records in October and November 2022 – contemporaneous with or just after Mr. Roglieri's transfer of the $20 million[1] – show where the money went, and how much of it was routed back to Berone from Quattro Capital in the way of "commission" or consulting fees. Exhibit K-A (attached).

As the Court recognized earlier in related civil litigation with respect to the Berone defendants, their business practices "are surrounded by questions of legitimacy and legality." Memorandum Decision and Order, dated June 24, 2024, at 8 [ECF Document No. 184 in 24-cv-55-MAD]. It also "strains credulity that a reputable business would send millions of dollars via wire transfer according to only a verbal authorization," particularly where there is record of written communications to the contrary. *Id.* at 7. While the Government knows seemingly where this money went, and while the Government will typically leave no stone unturned in its investigations, most of the $20 millions remains unaccounted for. At the end of the day, however, we do not project Mr. Roglieri's wrongdoing onto others; he accepts responsibility fully and unequivocally.

Finally, a few words are in order as to the Government's discussion and evidence [at page 8] of what it calls Mr. Roglieri's "depravity." This is too much. Arguing that the photographs attached as Government Exhibit B are in poor taste is one thing, and not a sentiment with which I disagree. Arguments as to why they are relevant, and why the Court should impose a lengthier sentence because of them, or why they call for needed rehabilitation, however, is quite another.

---

[1] Attached as Exhibit K-A (at page 3) are account records from September 2022 (October 2022 records were included as T), prior to the $20 million transfer, when there was little investment activity and money in the RBC account. Therefore, the subsequent multi-million dollar transfers out of the account are, perforce, with Prime's money.

Kris took a well-known line from the movie *Goodfellas*, and sought to trademark it, then selling t-shirts and other merchandise with the phrase, "fuck you pay me." He evidently thought it was funny or clever, given his business as a brash commercial lender. It became something of a meme or catchphrase amongst his circle, with various friends or employees getting the phrase tattooed on their bodies and for their own reasons. More important, Kris would donate the proceeds from sales of t-shirts or hats containing #fuckyoupayme to charity[2]. #Fuckyoupayme sounds (and is) crude, but it has benefitted a lot of people beyond Mr. Roglieri. Thousands of dollars went to worthy causes, including those referenced in the supporting character letters, as a result. It was a gag or a lark, not to be taken seriously as a reflection of an anti-social disposition. It became part of his own philanthropy.

As for the photographs in Government Exhibit B, we fail to see the relevance, other than to remind the Court that Mr. Roglieri can make himself look silly or even distasteful. Metadata and other information in the attached Exhibit Y, demonstrates that with one exception (the one in the garage with the helmet on), the photographs all predate the offense conduct, and were taken in 2021 or earlier, before the fraud began. If anything, this is consistent with what Mr. Roglieri argued in his own submission – that his luxury lifestyle and purchase of expensive goods and services began well before the fraud, and was therefore less probative. He did not commit wire fraud to acquire or perpetuate this lifestyle, despite compensating himself generously and spending lavishly.

A cellphone extraction and extensive social media presence will generally unearth some skeletons, or at the least, some unflattering content. But the Court should sentence Mr. Roglieri on the basis of his admitted conduct, not on moral disapproval of his lifestyle. If the photographs and social media clowning are a part of his "history and characteristics," they are neither a meaningful nor a relevant part of them, and should not factor into the Court's sentencing decisions. For these reasons, we ask the Court to impose a term between 4-6 years, and I thank the Court for its consideration. Finally, at sentencing, I will ask the Court to recommend to BOP that it place Mr. Roglieri at FCI-Otisville, to facilitate family and child visitation.

Respectfully submitted,

Jeremy B. Sporn

Cc:    AUSA Joshua Rosenthal (by ECF)

---

[2] This strikes defense counsel as analogous to *The Decision*, which was an ESPN prime-time special interview with LeBron James in 2010, in which he announced his intention to sign with the Miami Heat. It may have been tone deaf and self-absorbed, and he received a great deal of criticism both at the time and since (especially in Cleveland), but it served a good end: raising approximately $6 million for a local Boys & Girls Club in Connecticut, as well as other charities. *See* https://www.cleveland.com/ohio-sports-blog/2010/07/lebron_james_decision_generate.html.