

**United States Department of Justice**

*United States Attorney*
*Northern District of New York*

*445 Broadway, Room 218*                    *Tel.: (518) 431-0247*
*James T. Foley U.S. Courthouse*            *Fax: (518) 431-0249*
*Albany, New York 12207-2924*

March 31, 2026

**BY ECF**

Hon. Mae A. D'Agostino
U.S. District Judge
Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207

RE:    **United States v. Kris Roglieri**, No. 1:24-CR-392 (MAD)

Dear Judge D'Agostino:

I respectfully submit this letter in response to certain of the points raised in the defendant's sentencing memoranda filed at Dkt. ## 100, 107.  The government will not respond point by point to the defense's prolix submissions but will instead provide brief responses concerning the most salient issues for sentencing.

*First*, the defense disputes the U.S. Probation Office's scoring of a two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c).  *See* Dkt. # 100 at 3 & n.1; Final Presentence Investigation Report (PSIR) (Dkt. # 102) ¶ 88 & at 41-43.  The defense is wrong.  Indeed, the defendant's unmistakable status as the leader of this conspiracy is laid bare in the defense's own opening sentencing memo.  In the defense's telling, the enhancement does not apply because Roglieri's "control over [his co-conspirators] was limited" and "more in line with a facilitator than a leadership role."  PSIR at 42.  But then the defense goes on to explain, in painstaking detail, how Roglieri personally provided $20 million in Prime Capital Ventures, LLC ("Prime Capital") client ICA money to entities that he purportedly believed would generate enough money to fund loans for those clients.  *See* Dkt. # 100 at 3-17.  Simply put, it is hard to imagine a better example of a defendant's "exercise of decision-making authority," U.S.S.G. § 3B1.1 App. n.4, than Roglieri's near complete discretion to use such a large amount of client funds and fraud proceeds.  This degree of control confirms the leadership role that Roglieri's title as Prime Capital's CEO already evinces.  *See United States v. DeRiggi*, 72 F.3d 7, 9 (2d Cir. 1995) (per curiam) (holding that "when a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a [leadership enhancement] is proper"); *United States v. Duncan*, 42 F.3d 97, 106 (2d Cir. 1994) (leadership enhancement properly applied because defendant was president of a real estate development corporation that was "the primary vehicle" through which bribes were made, and it was established that the defendant "knew of and profited from [the] corruption.").

Page 2

Roglieri's leadership role is further demonstrated by his taking an outsize share of the fraud proceeds for himself. As Roglieri admitted in his plea agreement, he personally obtained more than $55 million in fraud proceeds. Dkt. # 90 ¶ 5(p). In stark contrast, co-conspirators Kimberly Owen and Christopher Snyder received approximately $512,000 and $233,000 in fraud proceeds, respectively. *See* Dkt. # 4, *United States v. Kimberly Owen*, Case No. 1:25-cr-238 (MAD) (N.D.N.Y. June 10, 2025); Dkt. # 4, *United States v. Christopher Snyder*, Case No. 1:25-cr-195 (MAD) (N.D.N.Y. May 16, 2025). These drastic differences among the co-conspirators is another reason that the leadership enhancement applies to Roglieri. *See United States v. Gaskin*, 364 F.3d 438, 467 (2d Cir. 2004) (enhancement properly scored where "[u]ndoubtedly, [defendant] claimed the largest fruits of the crime"); *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (per curiam) (enhancement applied where "as owner of Tri Auto, [defendant] was a principal beneficiary of the improper auto sales").

Against this backdrop, the defense's complaints that co-conspirator Kimberly Owen "was more in charge of day-to-day operations, and responsible for attracting borrowers and nailing down agreements," PSIR at 42, rings hollow. Even assuming the truth of those claims *arguendo*, the fact that a defendant's co-conspirator "played a larger role in the day-to-day management of the criminal activity in th[e] case does not foreclose a finding that [the defendant] was also a 'leader' of the activity" for the purposes of U.S.S.G. § 3B1.1 enhancement. *Wisniewski*, 121 F.3d at 58 (citing U.S.S.G. § 3B1.1 App. n.4).

Thus, the Court should apply U.S.S.G. § 3B1.1(c) here.

***Second***, the defense next advances the erroneous argument that Roglieri is entitled to the two-level "Zero-Point Offender" deduction under U.S.S.G. § 4C1.1. *See* Dkt. # 100 at 3 & n.1; PSIR ¶ 88 & at 41-43. As explained above, an aggravating role enhancement is merited here. Such an enhancement precludes Roglieri from receiving the U.S.S.G. § 4C1.1 deduction. *See* U.S.S.G. § 4C1.1(a)(10). But even if the Court declines to score an aggravating role enhancement under U.S.S.G. § 3B1.1(c) (and it should certainly score that enhancement), Roglieri is still disqualified from Zero-Point Offender status because he "personally cause[d] substantial financial hardship" to his victims. U.S.S.G. § 4C1.1(a)(6). The factors that courts consider in examining whether a financial hardship has been caused include whether a victim: (i) "bec[ame] insolvent" or "fil[ed] for bankruptcy," (ii) "ma[de] substantial changes to his or her living arrangements, such as relocating to a less expensive home," (iii) "ma[de] substantial changes to his or her employment, such as postponing his or her retirement plans," and (iv) "suffer[ed] substantial harm to his or her ability to obtain credit." U.S.S.G. § 3B1.1 App. n.4(F); *see* U.S.S.G. § 4C1.1(b)(3) (cross-referencing U.S.S.G. § 3B1.1 definition). Here, several victims' statements prove the point amply. *See* PSIR at 44-45 (victim stating "my real estate business went bankrupt" and "I have liquidated all my retirement accounts, investment accounts, and sold off my real estate in order to reduce down my financial obligations outstanding"); *id.* at 48 ("I have had to postpone retirement indefinitely and continue working in high-stress environments to manage the obligations resulting from this crime"); *id.* at 56 (victim company "now preparing to reorganize under Chapter 11 bankruptcy, a step we view as an unavoidable consequence of the financial devastation caused by this fraud"); *id.* at 102 ("Our credit has been severely and permanently damaged, limiting our ability to obtain financing, housing, and reasonable credit terms") (emphasis omitted). Thus, Zero-Point Offender status is foreclosed by U.S.S.G. § 4C1.1(a)(6). *See, e.g.*, *United States v. Cheng*,

Page 3

2025 WL 573767, at *3 (S.D.N.Y. Feb. 21, 2025) (defendant caused substantial financial hardship where victims attested that "[their] losses had [a] devastating impact on their lives and livelihoods, including by preventing individuals from purchasing family homes and obtaining credit, forcing companies to lay off employees, and driving others to the brink of collapse") (internal citations omitted); *United States v. Spitzer*, 2025 WL 81348, at *3 (N.D. Ill. Jan. 13, 2025) (substantial financial hardship found in case where victims "reported that they faced financial ruin as a result of their losses, could not retire, or had to return to work at an advanced age").

*Third*, the defense's sprawling revisionist history of the defendant's fraud scheme loses sight of the forest in its sweeping quest to examine every tree. While the defense seems to place most of the blame for Roglieri's misconduct on his supposed reliance on two third-party funds, the fact remains that he was deceiving his victims both before he engaged with those third parties and after he says that he was duped by them. For instance, as early as June 2022, Owen was warning the defendant that he could not fund Prime Capital's clients, but the defendant still went on to take numerous clients' ICA payments and then spend that money on himself. *See, e.g.*, Dkt. # 90 ¶ 5(f). What is more, in May 2002—well before Roglieri got involved with the third parties he now faults—Prime Capital had already produced and published a video falsely claiming that Prime Capital had successfully funded an $188 million hotel project in Atlanta, Georgia when it actually had done nothing of the sort and was even secretly paying the proprietor of the hotel project to act as a reference for Prime Capital. *See, e.g.*, PSIR ¶ 15. The defense also tries to downplay how Roglieri fraudulently obtained and quickly spent a $5 million ICA from victim 1800 Park by insisting that he just "overlooked the significance" of certain terms in his agreement with 1800 Park. Dkt. # 100 at 25. That suggestion strains credulity. Among many facts that put the lie to it are: (i) Roglieri in the same month as the 1800 Park fraud told another client that "there really isn't any risk" in working with Prime Capital because the ICA money "gets put into a pledged account," (ii) Prime Capital was in involuntary bankruptcy proceedings based on (true) allegations that Roglieri was running a massive Ponzi scheme when Roglieri signed the agreement with 1800 Park, and (iii) Roglieri almost immediately spent 1800 Park's ICA payment to, *inter alia*, fund a prior client, take a private jet vacation, and buy a Rolex that costs more than most families bring home in a year. *See, e.g.*, Dkt. # 90 ¶ 5. At bottom, there are certain mitigating factors that the Court can and should consider at sentencing, but the defendant's claim about being scammed by other fraudsters is barely one of them.

*Finally*, the defense's commentary on the government's exhibits—which goes so far as to liken the defendant to basketball superstar LeBron James—misses the point.[1] The fact that the defendant was obsessed with wealth prior to engaging in fraud, *see* Dkt. # 107 at 4, is hardly mitigating. If anything, the defendant's longstanding desire for luxury cars and goods suggests that the defendant committed this crime to supercharge his extravagant hobbies. One last exhibit from the defendant's social media again underscores how his lamentable worldview permeated his charitable activity. *See* Ex. A.

---

[1] To again put the magnitude of this crime in context, during the 2022-23 season, LeBron James earned, as the second highest paid athlete in professional basketball, about $10 million *less* than Roglieri personally obtained from this fraud scheme. *See* ESPN, *NBA Player Salaries - 2022-2023*, *available at* https://www.espn.com/nba/salaries/_/year/2023.

Page 4

* * *

For these reasons and those set forth in the government's sentencing memorandum, the defendant should receive a sentence of imprisonment towards the high end of 97-to-121-month Guidelines range to be followed by a three-year term of supervised release.

Respectfully submitted,

TODD BLANCHE
Deputy Attorney General

JOHN A. SARCONE III
First Assistant United States Attorney

By:    _____
Joshua R. Rosenthal
Assistant United States Attorney
Bar Roll No. 700730

cc:    Counsel of record (by ECF)
       U.S.P.O. Steven Sheffer (by Email)